UNITED STATES of America, Plaintiff-Appellee,

v.

William E. WELLIVER, Defendant-Appellant.

No. 78–5565.

United States Court of Appeals, Fifth Circuit.

Aug. 23, 1979.

Rehearing Denied Oct. 19, 1979.

Stephen Lindsey Gorman, Tallahassee, Fla., for defendant-appellant.

Donald S. Modesitt, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before MORGAN, FAY and RUBIN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

Appellant, William E. Welliver, former president of Bay National Bank and Trust Company, Panama City, Florida (Bay National), was convicted of violations of 18 U.S.C.A. §§ 656[1] and 1005[2] pertaining to "willful misapplication" of funds and the making of false entries, respectively. On appeal Welliver presents a number of arguments for the reversal of his conviction.

The case revolves around two similar business transactions involving standard

---

1. 18 U.S.C.A. § 656 provides in pertinent part:

Theft, embezzlement, or misapplication by bank officer or employee

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplied any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, pur-

loined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

2. 18 U.S.C.A. § 1005 provides in pertinent part:

Bank entries, reports and transactions . .

Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, .or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

banking practices for the handling of certain loan transactions. In the first transaction, on November 19, 1974, Welliver, while president and under the direction of John Christo, Jr., chairman of the board and majority shareholder of the bank,[3] telephoned Lewis State Bank, Tallahassee, Florida, where Bay National had a correspondent account, and instructed them to charge Bay National's correspondent account with approximately $341,000 and use the amount attained thereby to pay off a loan which Lewis State Bank had on account with A. I. Christo.[4] Shortly thereafter, a charge ticket from Lewis State Bank, dated November 20, 1974, was received by Bay National's bookkeeping department showing that Bay National's correspondent account had been so charged. Bay National's auditor promptly reconciled this charge by entering it on the bank's reconcilement ledger.[5] There was no specific offset made to Bay National's general ledger, however, until February 13, 1975. This delay was due to certain bank accounting procedures. These procedures required that before a specific entry could be made indicating that the bank had paid out a certain sum, there had to be available funds or an account against which the sum could be offset. The delay for roughly three months in the making of this entry was, in effect, a three month loan of approximately $341,000 to A. I. Christo for which interest at the market rate was paid in full. In the second transaction, on February 3, 1975, Welliver, while president and again under the direction of John Christo, Jr., instructed that the Florida National Bank of Jacksonville (Florida National) transfer approximately $150,000 out of Bay National's correspondent account through the Federal Reserve System to the First National Bank of Fort Walton (First National). This money was then used by First National to pay off a loan taken out by the BALBI Corp.[6] Within a few days a charge ticket dated February 3, 1975, was received by Bay National's bookkeeping department from Florida National showing that Bay National's correspondent account had been charged approximately $150,000. This charge was entered on Bay National's reconcilement ledger. Again, due to the bank's accounting procedures, no specific offset was made to Bay National's general ledger until several months later on April 4, 1975, this delay being, in effect, a loan which was later repaid in full with interest.

The government's position in this case has been that Welliver unlawfully misapplied bank funds in contravention of § 656 when he paid out approximately $150,000 on one occasion and $341,000 on another occasion and allowed these amounts to remain outstanding without a written obligation for repayment for a matter of months. Additionally, the government argued that, until specific offset entries were made to reconcile the transfers, the bank's Daily Statement of Condition and the Call Report of the Comptroller of the Currency[7] contained false entries in violation of § 1005. The alleged false nature of these entries was due, the government asserts, to the fact that they indicated more money was due and owing to Bay National from its correspondent accounts with Florida National and Lewis State Bank than was actually due at that time. Welliver was convicted for both the "willful misapplication" and the "false entry" offenses and instituted this appeal.

---

3. Under Bay National's by-laws Christo had all the authority of the Board of Directors when they were not in session.

4. President of Christo Stores, Inc.

5. A reconcilement ledger is used to explain the difference between the actual status of the company's accounts and the status of those accounts reflected in the company's general ledger. Discrepancies may exist between the general ledger and the actual values for certain accounts because of delays while funds are waiting to clear or legal agreements are finalized. Numerous other factors may cause such discrepancies to exist.

6. John Christo, Jr., through his family, owned and controlled 47½% of the BALBI Corp. stock, Charles Whitehead owned 47½%, and Welliver owned the remaining 5%.

7. Once a transaction is recorded on the bank's general ledger, it is then reflected in the bank's Daily Statement of Condition and the Call Report of the Comptroller of the Currency.

We first address Welliver's argument that the "willful misapplication" counts [8] were insufficient because the statutory language of § 656 is not sufficient, in and of itself, to charge an offense, due to the unsettled meaning of the phrase "willful misapplication." More particularly, Welliver asserts that the indictment failed to show how the funds were illegally and unlawfully applied. It is well settled that an indictment must set forth the offense with sufficient clarity and certainty to apprise the accused of the crime with which he is charged. *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Bearden,* 423 F.2d 805, 810 (5th Cir. 1970). This standard is applied using two criteria: (1) whether the indictment contains the elements of the offense charged and sufficiently apprises the defendant so that he will not be misled while preparing his defense; and (2) whether the defendant is protected against another prosecution for the same offense. *Russell v. United States,* 369 U.S. at 763–764, 82 S.Ct. 1038; *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). We find that the counts here called into question are sufficient under the criteria set forth above. Each count, following the language of the statute, set forth all the elements of the offense: (1) that the accused was an officer of a bank, (2) that the bank was connected in some capacity with a National bank, (3) that the accused willfully misapplied the funds of said bank, and (4) that the accused acted with intent to injure and defraud said bank.[9] Furthermore, the counts specified the date of the offenses, the amounts involved and the name of the bank. *United States v. Mann,* 517 F.2d 259, 267 (5th Cir. 1975); *United States v. Schoenhut,* 576 F.2d 1010, 1024 (3rd Cir. 1978). Moreover, this court has held that "[i]n a prosecution under 18 U.S.C. § 656, where the offense is set out in the language of the statute, the omission of the means by which the offense was committed does not render the indictment insufficient." *United States v. Bearden,* 423 F.2d at 810, *citing United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir. 1968). Finally, the phrase "willful misapplication" is not of such vague and uncertain application so as to require supplemen-

**8.** Counts I and VIII were the alleged violations of § 656:

COUNT I

"From on or about November 19, 1974, and continuing thereafter to on or about February 13, 1975, in the Northern District of Florida, WILLIAM E. WELLIVER, being an officer; that is, President, of The Bay National Bank and Trust Co., Panama City, Florida, a member bank of the Federal Reserve System, with intent to injure and defraud The Bay National Bank and Trust Co., Panama City, Florida, did wilfully and knowingly misapply and cause to be misapplied monies and funds of the said bank in the amount of $341,739.69, by fraudulently causing to be disbursed $341,739.69 from the correspondent account of The Bay National Bank and Trust Co., Panama City, Florida, located at the Lewis State Bank, Tallahassee, Florida, in payment of a loan to A. I. Christo, and thereby converting the said $341,739.69 to the use of A. I. Christo, in violation of Title 18, United States Code, Section 656."

COUNT VIII

"On or about February 3, 1975, and continuing to on or about August 4, 1975, in the Northern District of Florida, WILLIAM E. WELLIVER, being an officer; that is, President of The Bay National Bank and Trust Co., Panama City, Florida, a member bank of the Federal Reserve System, with intent to injure and defraud The Bay National Bank and Trust Co., Panama City, Florida, did wilfully and knowingly misapply and cause to be misapplied monies, funds, and credits of the said bank in the amount of $151,320.31 by fraudulently causing to be disbursed monies, funds and credits of said bank to The First National Bank of Fort Walton Beach, Fort Walton Beach, Florida, for the credit of BALBI Corporation, in payment of a loan in the name of BALBI Corporation at The First National Bank of Fort Walton Beach, Fort Walton Beach, Florida, thereby converting the said $151,320.31 to the use and benefit of BALBI Corporation, in violation of Title 18, United States Code, Section 656."

**9.** "Intent to injure or defraud" is an essential element of a § 656 violation and must be proved. Some cases have suggested, however, that this need not specifically be alleged because the allegation of "willful misapplication" sufficiently imports an intent to injure or defraud. See *Ramirez v. United States,* 318 F.2d 155, 157–58 (9th Cir. 1963); Reviser's Note to 18 U.S.C. § 656. Since the indictment in this case specifically alleges that Welliver acted with intent to injure and defraud, we need not decide whether failing to so allege constitutes a fatal defect in an indictment.

tation by further averment. *United States v. Mann,* 517 F.2d 259, 267 (5th Cir. 1975). Accordingly, we hold Counts I and VIII of the indictment to be sufficient.

■ Next we address Welliver's contention that, because there was insufficient evidence as a matter of law to support the charges, the trial judge was in error in denying Welliver's motions for a judgment of acquittal and for a new trial. First, Welliver argues that as pertains to the "willful misapplication" offense, there was insufficient evidence of an intent to defraud because there was no showing of a wrongful or improper transfer of funds. The rule in this circuit, however, is that "the government, in prosecutions under § 656, proves the requisite intent to defraud and injure by showing 'an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank.'" (citations omitted). *United States v. Killian,* 541 F.2d 1156, 1160 (5th Cir. 1976). See *United States v. Southers,* 583 F.2d 1302, 1305 (5th Cir. 1978); *United States v. Tidwell,* 559 F.2d 262, 265 (5th Cir. 1977). We believe that the evidence, viewed in the light most favorable to the government,[10] is sufficient to show that Welliver's voluntary manipulations left the bank in the position of having paid out large sums of money without obtaining a legally binding obligation for repayment, an act the natural tendency of which would be to injure the bank. See *United States v. Killian, supra.* Accordingly, we find no error in the trial judge's refusal to grant the motions for judgment of acquittal and for a new trial in regards to the "willful misapplication" offense. Welliver also argues, that as to the "false entry" offenses, the evidence was insufficient to prove that the entries were actually false nor was there any evidence indicating that it was Welliver's responsibility to modify or correct such an entry. Viewing the evidence in the light most favorable to the government [11] we find that it

was sufficient to withstand Welliver's motions. The essence of a § 1005 offense is the intentional making or causing to be made a bank entry which represents what is not true or does not exist. Here there was testimony by Bay National's auditor that he had spoken to Welliver several times regarding the preparation of an offset entry and that Welliver had replied that he was working on it. Thus, the jury could have concluded that Welliver both had responsibility for making of the offset entries and knew the entries were misrepresenting the true facts.

■ Welliver next argues that he did not receive a fair and impartial trial because of the prejudicial questioning and comments by the trial judge. As Judge Hill stated in *United States v. Daniels,* 572 F.2d 535, 541 (5th Cir. 1978):

Although a trial court judge may interrogate a witness to clarify his testimony or to insure that a case is tried fairly, *Manchack v. S/S Overseas Progress,* 524 F.2d 918, 919 (5th Cir. 1975); *Curd v. Todd-Johnson Dry Docks,* 213 F.2d 864, 866 (5th Cir. 1954), the court in the case on appeal overstepped the bounds of appropriate judicial intervention. When a judge interjects himself into a trial by questioning witnesses, the judge places the opposing counsel in a disadvantageous position. The attorney may hesitate to object to the judge's examination for fear of creating a conflict, or appearing to create a conflict between the judge and himself. Therefore, when the attorneys are competently conducting their cases, it is improper for the trial judge to question the witnesses. *Gomila v. United States,* 146 F.2d 372, 373–76 (5th Cir. 1944).

Accord, *Bursten v. United States,* 395 F.2d 976, 982–83 (5th Cir. 1968). In the present case the judge repeatedly usurped the questioning of witnesses from counsel who were competently conducting the examination.[12]

---

**10.** *Montoya v. United States,* 402 F.2d 847, 850 (5th Cir. 1968).

**11.** See note 10.

**12.** Upon careful scrutinization of the record it is clear that the cumulative effect of the many and manifest interventions by the trial judge deprived appellant of a fair trial. During the

Consequently, the jury may have been inadvertently led to believe, from the judge's repeated questioning and from his comments, that he was of the opinion that the defendant was guilty and should be convicted. Accordingly, we find that the trial judge improperly interjected himself into the trial below in such a manner and to such an extent as to deny Welliver a fair and impartial trial.

Welliver also argues that the trial judge erred in instructing the jury that a "reckless disregard of the interest of the bank is the equivalent of intent to injure or defraud the bank" for purpose of both §§ 656 and 1005.[13] An essential element of

course of the short trial the judge interrupted the prosecutor's questioning approximately 17 times, asking various witnesses over 125 questions, while interrupting defense counsel three times, asking around 22 questions. While it would be impractical for us to set forth all instances of undue influence, the following examples, albeit out of context, clearly indicate that the trial judge overstepped the bounds of judicial trial propriety.

At one point after witness Holland, the bank's auditor, had explained that the entries in question were reflected properly on the reconcilement ledgers, the court interrupted the prosecutor and said:

"THE COURT: Let me see, we've been into this twice, sir, now. You're saying one time that it's not false apparently, and one time it is?

A. No, sir.

THE COURT: Let me see if I can understand, sir.

A. Okay.

THE COURT: You signed this exhibit 13?

A. That's right.

THE COURT: You have previously testified that an entry on it was not true in the sense that this seven million, whatever it was, reflected money due that was not due?

A. No, sir, that is—

"THE COURT: This call was a report that was made to the Comptroller of the Currency?

A. That is right?

THE COURT: Didn't you so previously testify?

A. No, sir."

Later in the examination of witness Holland this colloquy occurred:

THE COURT: He was relying on it?

A. That's right, sir.

THE COURT: It said on that report to him that the total amount of cash and due from banks was six million three hundred seventy thousand three hundred twenty-seven dollars forty-six cents?

A. Yes, sir.

THE COURT: Yet the total cash and due from banks was not that much because it was overstated by that hundred fifty-one thousand dollars?

A. We get right back to my misunderstanding somewhere.

THE COURT: Now let's don't you talk about your misunderstanding or mine because I have the privilege of asking the question.

A. Okay.

THE COURT: I'm the one trying to get clarification from you.

A. Okay, sir.

THE COURT: You said it was overstated by that hundred fifty-one thousand dollars, wasn't it?

A. Yes, sir.

THE COURT: So to that extent it was not correct?

A. So to that extent it was not correct.

THE COURT: Yet you don't consider that it was incorrect? The Comptroller, it was going to him, he was going to take that figure.

A. There again I, my understanding, I mean I misunderstand also, but I understood, the way I understood it, you're right, it was an error, a misstatement of figure. And I understood the question as to say did I consider that I had put anything down that I shouldn't have, which I, I or any preparer must rely on, as I said before, the books. But it was an overstated figure to one hundred fifty-one thousand dollars.

THE COURT: And therefore it was an incorrect statement?

A. Yes, sir.

THE COURT: And was not a true statement?

A. Right.

THE COURT: You don't say otherwise? You told me something else.

A. Right."

13. The judge's instructions to the jury were, in pertinent part:

"You will note that the words "intent to injure or defraud" appear as an essential element in each of these counts of the indictment. To act with—in fact every count of the indictment. To act with intent to defraud means to act willfully and with a specific intent to deceive or cheat.

"The requirement that the defendant intended to injure or defraud the bank may be shown by an unlawful act, voluntarily done, the natural tendency of which may have been to injure the bank. It is not necessary, however, that actual injury to the bank be shown.

"A reckless disregard of the interest of the bank is the equivalent of intent to injure or defraud the bank.

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may but is not required to draw the inference and find that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably

a violation of either of these statutes is that the defendant acted with an "intent to injure or defraud." This requirement is contained within the language of § 1005. The language of § 656, however, merely prohibits a "willful misapplication" of funds with the requirement of an "intent to injure or defraud" having been judicially imposed. *United States v. Mann*, 517 F.2d at 267.

As pertains to § 656, this court has held that a "'reckless disregard of the interest of a bank is, for purpose of "willful misapplication," the equivalent of intent to injure or defraud.'" *United States v. Reynolds*, 573 F.2d 242, 244–45 (5th Cir. 1978) *quoting United States v. Wilson*, 500 F.2d 715, 720 (5th Cir. 1974). Consequently, the trial judge's instruction was correct as to § 656.

As pertains to § 1005, however, this court has never held "recklessness" to be sufficient to satisfy the specific intent requirement, nor do we think it should. We agree that "recklessness" may be a reasonable basis in some cases for punishing the making of a "false entry," such as where it appears that there has been a deliberate attempt to avoid knowing whether the entry is fraudulent or deceptive. However, it does not necessarily follow that in all cases proof of a specific intent to injure or defraud should be eliminated by a vague generalization equating recklessness with intent to defraud. *See generally, Berkovitz v. United States*, 213 F.2d 468 (5th Cir. 1954); *Wardlaw v. United States*, 203 F.2d 884 (5th Cir. 1953). When a trial judge in his instructions refers to "recklessness", no more is necessarily implied than such mere negligence, carelessness, thoughtlessness, or inadvertence as could not be regarded as the equivalent of an intentional wrong.

We believe that the instruction given by the trial judge was in error with respect to the alleged violations of § 1005. The instruction should either have contained a definition of "recklessness" requiring that more than mere negligence, carelessness, thoughtlessness, or inadvertence be found before the entry could be found to have been made with an "intent to defraud", or it should have been made apparent to the jury that it did not have to find an intent to defraud merely because the defendant acted recklessly.[14]

 Finally, Welliver contends the trial judge erred in refusing to allow his witnesses to testify concerning the acquiescence of the bank's board of directors in the actions of the appellant, such consent being a matter of defense. We disagree. Determinations of the relevance and admissibility of evidence lie largely in the discretion of the trial court. Its ruling will not be disturbed in the absence of a clear showing of abuse of discretion. *United States v. 110 Bars of Silver, 3 Crucibles of Silver, 11 Bags of Silver Coins*, 508 F.2d 799, 802 (5th Cir. 1975). We find no such abuse here. The evidence was concerning an acquiescence which occurred after the transactions in question and, as such, was of dubious value in establishing the intent of the defendant at the time the transactions took place.

In order that a new trial, free from prejudicial error, may be accorded the appellant, the judgment is

REVERSED and REMANDED.

have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant possessed the requisite criminal intent."

**14.** In a somewhat analogous situation this court and others have recognized that although a jury may find an intent to defraud from the fact that a person presumably intends the natural consequences of his actions, an instruction to that effect should not require the jury to make such a finding, or even shift the burden of proof to the defendant. *See, e.g., United States v. Bristol*, 473 F.2d 439, 443–44 (5th Cir. 1973); *United States v. Parker*, 469 F.2d 884, 894–95 (10th Cir. 1972); *McCarty v. United States*, 409 F.2d 793 (10th Cir. 1969), *cert. den.* 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87; *Berkovitz v. United States*, 213 F.2d 468, 476 (5th Cir. 1954) *citing Wardlaw v. United States*, 203 F.2d 884 (5th Cir. 1953). *See also Sandstrom v. Montana*, —— U.S. ——, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).