UNITED STATES of America, Plaintiff,

v.

James J. McANALLY, Defendant.

No. 80 CR 679.

United States District Court,
N. D. Illinois, E. D.

March 2, 1981.

Thomas P. Sullivan, U. S. Atty., J. Daniel Stewart, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Matthias A. Lydon, Pierce, Webb, Lydon & Griffin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

After a four-day jury trial of James J. McAnally ("McAnally") on a nine-count indictment,[1] the jury was unable to reach a verdict on Counts 1 through 6 (all of the misapplication of bank funds charges) and found McAnally guilty on each of Counts 7, 8 and 9 (the false entries charges). McAnally has filed motions (1) for a judgment of acquittal on all nine counts and (2) for a new trial on Counts 7, 8 and 9. For the reasons stated in this memorandum opinion and order, each of McAnally's motions is denied.

### Motion for Judgment of Acquittal

McAnally acknowledges that on a Fed.R. Cr.P. ("Rule") 29 motion for a judgment of acquittal, the Court must view all the evidence in the light most favorable to the government. *United States v. Blasco*, 581 F.2d 681, 684 (7th Cir. 1978). Application of that standard necessarily leads to the conclusion that McAnally's motion must be denied.

As to the misapplication of bank funds charges (Counts 1–6) McAnally's only asser-

[1]. There were essentially two sets of transactions involved in the nine counts. One set, involving three cashier's checks of North Point State Bank (the "Bank") caused to be issued by McAnally, was the basis for Counts 1, 2 and 3, charging violations of 18 U.S.C. § 656 ("Section 656" or the "misapplication of bank funds" section). Three other cashier's checks gave rise to Counts 4, 5 and 6, also charging viola- tions of the misapplication of bank funds section. Finally, allegedly false entries on the Bank's Installment Loan Log, stemming from the same loans that led to the charges in Counts 4, 5 and 6, were the predicate for Counts 7, 8 and 9, charging violations of 18 U.S.C. § 1005 ("Section 1005" or the "false entries" section).

tion is "There was insufficient evidence from which the jury could reasonably have found beyond a reasonable doubt that the defendant acted with intent to defraud the North Point State Bank." On Counts 1–3 the testimony of William Tedtman is that McAnally *knew* (because Tedtman told him) (1) that the loan proceeds disbursed by the three cashier's checks were in fact for Tedtman and not for the persons named in the cashier's checks or notes evidencing the indebtedness and (2) that Tedtman could not have borrowed in his own name because he was up to the maximum loan limit from the Bank by reason of other outstanding loans. Loans in excess of the Bank's legal lending limit to any individual were in violation of law and would not have been made by the Bank but for McAnally's conduct in collusion with Tedtman.

Counts 4–6 involve substantially identical testimony. That testimony is further buttressed by Tedtman's testimony that McAnally knew the three purported borrowers were non-existent fictitious names and that McAnally later knowingly substituted three real individuals (identified in the indictment) who signed notes more than two months after the funds had been disbursed. All this time McAnally knew that Tedtman was the real beneficiary and, as with the earlier transaction, that Tedtman could not borrow in his own name because he was up to the legal loan limit with the Bank.

■ All that evidence, which must be taken as true on McAnally's motion, refutes entirely McAnally's assertion that "the Government presented no credible evidence to rebut the defendant's assertions of good faith."[2]

■ As for the false entry charges (Counts 7–9), the evidence (viewed in the same way) is more than ample to support the guilty verdict the jury in fact returned. In the words of the indictment the false entries in the Bank's books (the Installment Loan Log maintained in connection with installment loan transactions at the Bank) occurred:

in that the defendant stated and caused to be stated in said Installment Loan Log that the loans listed below were made on or about February 26, 1977 to the named borrowers listed below, in the amounts indicated, whereas, as the defendant then and there well knew, the proceeds of said loans were actually distributed to William Tedtman, each entry being a separate count of the indictment:

| COUNT | DATE OF ENTRY | NAMED BORROWER | AMOUNT (Principal and Interest) |
|---|---|---|---|
| Seven | 2/26/77 | Dale Craycraft | $11,292.60 |
| Eight | 2/26/77 | Kenneth Grodsky | 12,547.80 |
| Nine | 2/26/77 | Ronald Punch | 12,547.80 |

In fact the loans were made *not* on February 26, 1977 but on December 17, 1976, more than two months earlier—that was the date $29,000 in proceeds had been disbursed to Tedtman, McAnally knowing that fact and knowing that the purported payees of the cashier's checks were non-existent fictitious payees. Indeed, Tedtman testified that *in McAnally's presence* Tedtman endorsed each check both with the name of the fictitious payee and with his own name. McAnally then cooperated with Tedtman to obtain the names of three bona fide individuals who could sign replacement notes.

No loans were in fact made on February 26, 1977, all that was done at that time being the execution of notes by the three individuals who received no proceeds and had no actual interest in the loans.[3] Mc-

**2.** There was substantial added corroborative evidence to support the same conclusion. Under the test of viewing evidence in the light most favorable to the government, however, it is unnecessary to review such further evidence. Tedtman's testimony directly incriminated McAnally and was sufficient in itself to establish his guilt beyond a reasonable doubt.

**3.** It may be noted that the three actual cashier's checks in December 1976 were for $11,000, $9,000 and $9,000—one thus being in excess of McAnally's lending authority of $10,000 in any one transaction. When the new notes were executed in February 1977 with no new money being disbursed, the amounts on the new notes were changed to $10,000, $10,000 and $9,000, further independently confirming McAnally's knowledge of the irregularity of the transaction.

Anally himself testified that he knew in February 1977, when the loans were recorded, that Tedtman was the actual beneficiary of the loans, yet McAnally caused them to be recorded in the other three names of the note signers. Testimony of attorney Donald Brown, who organized and was a director of the Bank, to the effect that the Bank's regular practice was to record as the borrower the person who executed a note, could fairly have been understood by the jury as applying only to legitimate loans (not those *known* to be for the benefit of someone other than the note signer).[4] All the uncontroverted testimony was that the purpose of the Installment Loan Log was to obtain Board of Director approval of loans—approval that would never have been given to the loans to Tedtman in excess of his and Bank's legal limit.

Accordingly the evidence, again taken in the light most favorable to the government, plainly establishes each of the ingredients of the statutory false entries section. Consequently McAnally's motion for judgment of acquittal must be denied as to each of the nine counts of the indictment.

### Motion for New Trial

McAnally challenges the following jury instruction in the context of the "intent to injure or defraud" required under the false entries section of Title 18:

> A reckless disregard by a bank official of his bank's interest is sufficient to establish the requisite intent to defraud.[5]

**4.** Brown testified that he knew of no directive to Bank officers as to the reporting of accommodation notes, but that he knew of no such transactions in which the Bank was involved. On the evidence outlined above, the jury could justifiably have determined that the three February 1977 notes were simply improper and fraudulent rather than "accommodation notes" in the normal sense of that term.

**5.** That sentence came at the conclusion and as part of the following instruction on intent agreed upon by counsel for the government and McAnally:

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may, but is not required to, draw the inference and find that the defendant intended all of the consequences which one standing in like cir-

It is true that one court has distinguished in that respect between the misapplication of bank funds section (Section 656) and the false entries section (Section 1005), holding that "reckless disregard" is a proper instruction under the former and not the latter. *United States v. Welliver*, 601 F.2d 203, 209–10 (5th Cir. 1979). This Court's instruction on this subject was taken directly from the precise language of our Court of Appeals' opinion and decision in *United States v. Larson*, 581 F.2d 664, 667 (7th Cir. 1978), a case under Section 656.

■ With all respect, this Court cannot credit the distinction made by the Fifth Circuit in *Welliver*. "Intent to injure or defraud the bank" is a *judicially* established prerequisite under Section 656 (which has no specific language to that effect) and an express *statutory* ingredient of the crime under Section 1005. This Court cannot justify giving the identical words a different content in the two sections, thus requiring a different mental state for the two crimes. It views itself as bound by the *Larson* test for *both* purposes and in *both* sections.

■ Moreover, the instructions to the jury must be read in context. As already indicated, the jury was specifically instructed that it could not find the existence of a false entry unless it found that McAnally *knew* the entry to be false when made (emphasis added):

> cumstances and possessing like knowledge would reasonably have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant possessed the requisite criminal intent.

In turn, that instruction came immediately after the following instruction adapted from Devitt & Blackmar, Federal Jury Practice and Instructions § 50.11 (3d ed. 1977), also agreed upon by both counsel:

> An entry in a book maintained at a bank is false if it is untrue and is known to be untrue by the person causing the entry to be made. An entry may be false if it records a transaction which did not occur or inaccurately reports or records a transaction.

**412**

An entry in a book maintained at a bank is false if it is untrue *and is known to be untrue by the person causing the entry to be made.* An entry may be false if it records a transaction which did not occur or inaccurately reports or records a transaction.

In the Court's instruction as to propositions that must be proved beyond a reasonable doubt to sustain any false entry charge, the jury was further instructed that the government had to prove (emphasis added):

> Second: That the defendant *knowingly* made, or caused to be made, a false entry in the Installment Loan Log of the North Point State Bank.
>
> Third: That the defendant made such entry, or caused such entry to be made, wilfully and with *knowledge* of its falsity *and* with the *intent to injure or defraud* the North Point State Bank.

Even if *Welliver* were to be accepted as an accurate statement of the law under the false entries section, the other instructions just quoted would dispel the concerns expressed by the Fifth Circuit in *Welliver* and thus meet the *Welliver* standard.

██ McAnally's only other contention on his motion for new trial is that the "Court erred when it failed to instruct the jury that good faith was a complete defense to the charges of the indictment," citing the mail fraud case of *Steiger v. United States*, 373 F.2d 133, 135–36 (10th Cir. 1967). But the problem with McAnally's tendered instruction in that respect is that it did not flesh out "good faith" and could have been seriously misleading to the jury. For example, relating McAnally's proposed charge only to Counts 7–9, the jury might find McAnally had acted in "good faith" in the sense of not seeking that the Bank ultimately be harmed financially—hoping or believing that the loans would be repaid by Tedtman. However, such a frame of mind would not negate the "intent to injure or defraud Bank" in the sense employed in *Larson* and other cases. Thus McAnally's requested instruction could have misled the jury to an acquittal on Counts 7–9 even though all the elements of the crime, as

defined by the statute and the cases, had *in fact* been established beyond a reasonable doubt. And the same analysis applies to Counts 1–6. In short, to have charged in terms of "good faith" as McAnally requested, without providing any substantive content to keep the jury from error, would have created the potential for mischief and is unsupported by any case law under Sections 656 or 1005.

*Conclusion*

As already indicated at the outset of this memorandum opinion and order, the Court denies both McAnally's motion for judgment of acquittal on each of the nine counts and McAnally's motion for a new trial on Counts 7, 8 and 9.