**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James J. McANALLY, Defendant-Appellant.**

**No. 81–1453.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1981.

Decided Dec. 28, 1981.

Matthias A. Lydon, Chicago, Ill., for defendant-appellant.

Thomas M. Durkin, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Senior Circuit Judge, and CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

James McAnally was convicted of having violated 18 U.S.C. § 1005, which provides that any "officer, director, agent or employee of any Federal Reserve bank, member bank, national bank or insured bank" who "makes any false entry in any book, report, or statement of such bank with intent to injure or defraud" the bank shall be guilty of a felony punishable by up to five years' imprisonment. McAnally moved for an acquittal because of alleged insufficiency of the evidence and alternatively for a new trial because of alleged error in the jury instructions. Both motions were denied, 509 F.Supp. 408 (N.D.Ill.1981), and this appeal followed.

The jury could have found the following to be the facts. McAnally was a 27-year-old officer of a small (but federally insured) bank in Illinois. He was in charge of the installment-loan department. William

Tedtman was a principal shareholder of the bank and a heavy borrower from it. In December 1976 he approached McAnally, saying that he needed loans totaling $29,-000. Tedtman was already over his loan limit. McAnally knew this and earlier in the year had made loans to Tedtman under irregular circumstances. Tedtman told McAnally that he would provide signatories for the notes securing the $29,000 of loans but that he could not do so until after the first of the year. McAnally issued three cashier's checks, totaling $29,000, made out to names supplied by Tedtman. One of the checks exceeded McAnally's loan authority. McAnally neither prepared a loan report nor made an entry in the installment loan log book, where new loans were entered. Tedtman endorsed the checks to himself in McAnally's presence, signing the names of the fictitious (because they never received the checks) payees.

Two months later, on February 26, 1977, a friend of Tedtman brought three men to the bank, Punch, Grodsky, and Craycraft, who were willing to sign notes securing the $29,000 in loans that had already been made to Tedtman via the fictitious payees. They filled out loan applications and signed notes to cover the checks that McAnally had issued in December. McAnally wrote down the names of the three signers in the installment loan log book. Beside each name he wrote the date (February 26, 1977) and the amount of the note. The signers did not, of course, receive any money from the bank; their notes were in the nature of guarantees for the loans that had been made to Tedtman in December.

The notes were never repaid. Tedtman was later convicted of defrauding the bank. So far as appears, McAnally never received any payment or other benefit for the part he played in Tedtman's scheme; his motives remain obscure.

McAnally was indicted on six counts of violating 18 U.S.C. § 656, which makes it a felony for a bank officer to willfully misapply bank funds, as well as three counts of violating 18 U.S.C. § 1005—one count for each of the three entries that he made in the installment loan log book on February 26 in the names of Punch, Grodsky, and Craycraft. Trial was by jury. The jury hung on the six willful-misapplication counts, and they were later dismissed; but the jury convicted McAnally on the three false-entry counts and he was sentenced to three years' probation.

██ We think there was enough evidence—but barely enough—to convict McAnally of having violated section 1005. True, there was no false entry in a literal sense since the names of the three signers, the dates on which they signed the notes, and the amounts of the notes were all correctly entered in the installment loan log book. But the book was meant for loans, and the loans had been made two months earlier and no entry made at that time. The notes signed by Punch, Grodsky, and Craycraft, if not entirely sham, were at best accommodation notes; and we think a properly instructed jury could have found that to enter a questionable accommodation note in an installment loan log book was a false entry and moreover that McAnally, knowing that Tedtman had exceeded his loan limit and had procured unauthorized loans, intended in making these entries to injure the bank, even if he reaped no personal gain from cooperating in Tedtman's efforts to evade his loan limit. Cf. *United States v. Krepps*, 605 F.2d 101, 109 (3d Cir. 1979).

But the jury was not, we think, correctly instructed on a crucial element of the false-entry offense, namely intent to injure or defraud. The government tendered, and the court gave, the following instruction: "A reckless disregard by a bank official of his bank's interest is sufficient to establish the requisite intent to defraud." McAnally's counsel objected, saying he was "confused about . . . what the term, reckless means. It might mean one thing to the Court observing things, but what does it mean, and how does it guide the jury?" The court declined, however, to give a clarifying instruction, stating that "There are a lot of words that enter into charges to juries that indeed, it is preferable not to try to define when they operate within the

common sense notions of what reasonable men may know," and that "reckless" was one of them.

The term "reckless" covers a broad range of meanings to lawyers, and probably an even broader one to laymen. In law it is sometimes used interchangeably with gross negligence (Prosser, Handbook of the Law of Torts 185 (4th ed. 1971); *cf.* Williams, The Mental Element in Crime 57 (1965)); and in the absence of a clarifying instruction the jury might have so understood it here. If so, the jury may have seriously misunderstood the false-entry offense. That offense has two elements (so far as relevant here): a false entry, and an intent to injure or defraud. The first is satisfied by showing that the entry was inaccurate. If the second could be satisfied by showing that the inaccuracy was the result of gross negligence, then section 1005 would make gross negligence by bank employees in making entries on the books of the bank a felony. It is unlikely that the statute was intended to go so far to protect banks and their customers from the misconduct of bank employees. There must be at least a hundred thousand bank officers in this country, many of them, like McAnally, young and inexperienced employees of small and unsophisticated banks. These officers make in the aggregate millions of entries in the books of their banks every day; no doubt many of those entries are inaccurate; and many of the inaccuracies are probably due to negligence, some of it gross. We do not think Congress meant to expose all of these bank employees to felony prosecutions; the danger that the heavy penalties prescribed in section 1005 would overdeter, with resulting social costs vividly described in a different context by the Supreme Court in *United States v. United States Gypsum Co.*, 438 U.S. 422, 440–43, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), would be too great.

We hold that the false-entry offense is one of intent and not of carelessness. But traditionally in the criminal law an extreme form of recklessness has been treated as intentional and not merely careless wrongdoing. If a man plants a bomb on an airplane on which he is about to embark, and knows the bomb will kill the other passengers if (as he intends) it goes off, then in law he intends their deaths even though he cares only about killing himself and is indifferent to the fate of the others. Williams, *supra*, at 35. If McAnally, while not desiring to hurt his bank or take money from it, did things that he knew would hurt the bank and he was simply indifferent to that consequence, he could properly be convicted under section 1005. The jury should have been so instructed, but without using the term "reckless" which was likely to confuse.

From what we have said it should be clear that there is no conflict between our decision in this case and *United States v. Larson*, 581 F.2d 664 (7th Cir. 1978). That was a prosecution not under section 1005 but under 656, the willful-misapplication statute under which McAnally was also charged, but not convicted. Although section 656 does not contain the words "intent to injure or defraud," *Larson*, along with many other cases cited in the court's opinion, holds that in section 656 cases the jury must, to convict, find such an intent. This holding is based on the fact that sections 656 and 1005 were once the same statute, and became separated only through the unexplained decision of a reviser of the criminal code. *Larson* went on to hold that the "intent to injure or defraud" element of 656 is satisfied by proof of recklessness. Although recklessness is not precisely defined in *Larson*, a quotation from an earlier case suggests that the court had in mind not gross negligence but, rather, that indifference to consequences that we said has traditionally been regarded as a form of intentional wrongdoing: " 'Deliberate misapplication of bank funds suffices [to show intent to injure or defraud], even if—as is surely the norm—the actor is motivated purely by his own self-interest or that of another and wishes no harm to anyone.' " *Id.* at 667, quoting *United States v. Killian*, 541 F.2d 1156, 1159–60 (5th Cir. 1976).

But even if the court in *Larson* meant recklessness in the sense of gross negligence, there would be no anomaly—contrary to what the court below in the present case thought (*see* 509 F.Supp. at 411)—in rejecting this usage in section 1005 cases: a conclusion also reached by the Fifth Circuit, in the only other decision we have found on point, *United States v. Welliver*, 601 F.2d 203, 210 (5th Cir. 1979). The first element of the section 1005 offense is simply the making of a false entry, a very common and relatively innocuous act; if doing it with gross negligence completed the crime, the net of criminal liability would be cast farther than we think Congress intended. But the first element of the crime under section 656 is a willful misapplication of bank funds, a term that in itself connotes criminal wrongdoing. To require more than an extremely careless (i.e., reckless) disregard for the bank's interests to complete the offense would be superfluous; in fact, an intent to injure or defraud could perhaps be inferred from the willful misapplication itself, as the quotation in *Larson* from the *Killian* opinion suggests.

█ Nor do we think the error was cured by other language in the instructions. It is true that the instructions required the jury to find not only that a false entry had been made with intent to injure or defraud (the intent that the jury could find satisfied by proof merely of reckless disregard of the bank's interests), but also that the false entry had been made "willfully and with knowledge of its falsity." The court defined "willfully" to mean "that the act was committed by the defendant voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law and not by mistake, accident, or good faith." This language went far to correct the impression, which the "reckless disregard" instruction may have created, that the jury could convict without finding a deliberate falsity that McAnally knew would harm the bank. But the definition of "willfully" came toward the end of the instructions and referred to the use of the word throughout the instructions; the jury could easily have thought that the defini-

tion had primary reference to the willful-misapplication counts. Moreover, while the language "with knowledge that it was prohibited by law, and with the purpose of violating the law" pointed the jury in the right direction, what followed—"and not by mistake, accident, or good faith"—did not prevent the jury from finding grossly negligent misconduct to be willful. We therefore doubt that the court's references to willfulness cancelled the effect on the jury of the bald and erroneous statement that "reckless disregard of the bank's interest is sufficient to establish the requisite intent to defraud."

Bearing in mind the prosecutor's heavy burden of proof in a criminal case, we think the question of McAnally's guilt was close enough to make the error in the instructions seriously prejudicial to him. The false entries were, we said earlier, literally true, and a jury could have found that McAnally honestly if stupidly thought that the entries he made were true entries and not a fraud on the bank, since Punch, Grodsky, and Craycraft were (he may have thought) actual guarantors. And, unlike in *United States v. Krepps, supra*, a case otherwise somewhat similar to the present one on its facts, McAnally was not shown to have benefited personally from the false entries. In these rather ambiguous circumstances McAnally was entitled to an instruction that unequivocally, without confusing reference to recklessness, required that the jury, before it could convict him, would have to find that he intended to injure or defraud the bank. McAnally's motion for acquittal was properly denied, but he is entitled to a new trial. The judgment of conviction is therefore reversed and the case remanded for further proceedings in conformity with this opinion.

Reversed and Remanded.