**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Samuel Theodore BLOCK, Robert Edwards, Russell F. Gleason, Donald M. Beck, Defendants-Appellants.**

No. 83–8375.

United States Court of Appeals, Eleventh Circuit.

March 19, 1985.

Michael C. Ford, Atlanta, Ga., for Block.

Vernon S. Pitts, Jr., Atlanta, Ga., for Edwards.

Russell F. Gleason, pro se, and Steven Skelton, Bloomington, Ill., for Gleason.

Rhonda Brofman, Atlanta, Ga., for Beck.

Howard Weintraub, Asst. U.S. Atty., Atlanta, Ga., Sara Criscitelli, Appellate Section, Crim.Div., Washington, D.C., for plaintiff-appellee.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS *, District Judge.

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

R. LANIER ANDERSON, III, Circuit Judge:

Appellants were convicted of numerous counts of wire fraud, mail fraud, interstate transportation of a security which had been stolen, converted, or taken by fraud, and a single count of conspiracy. The convictions stemmed from an "advance fee" scheme that appellants and their co-conspirators operated in 1979 and 1980. Appellants argue that numerous alleged errors committed by the district court require a reversal of their convictions. We reject these contentions, and affirm.

## I. FACTS

Appellants Gleason and Beck were listed as officers of a Georgia corporation, Offshore Investments, Limited ("OIL"), that was engaged in the practice of brokering loans. Appellant Edwards acted as general counsel for the corporation and also participated in the corporation's brokerage activities. Appellant Block was a California broker who referred prospective borrowers to OIL and described himself as OIL's west coast representative. Three other individuals, Mr. Almeda, Mr. Stafford, and Mr. McCaffery, were indicted as co-defendants but were not present at trial since the government could not secure their presence in the United States.[1]

Almeda was the president of OIL. McCaffery and Stafford were affiliated with the London Irish Bank and also constituted an integral part of the scheme to defraud.

Brokers, including appellant Block, referred prospective borrowers who had been unsuccessful in obtaining financing from conventional sources to OIL. The borrowers then met with either Almeda, Gleason, or Beck at OIL's Georgia office. Generally, a representative of OIL stated that the corporation had been successful in securing collateral for large loans. The borrower

---

1. At the time of trial, Mr. Stafford was in custody in London. Mr. McCaffery was arrested in London during the trial of this case. Mr. Almeda is apparently in the Phillipines.

presented a package relating to their proposed project. Almeda, Beck, Block, or Gleason then reviewed the proposals with the borrowers.

OIL representatives informed the borrower that he should apply for a loan significantly greater than the amount needed in order to ensure that a portion of the loan would be available for placement in a "sinking fund" where it would supposedly compound sufficient interest over the term of the loan to repay the entire principal. OIL did not purport to make loans. Instead, OIL's representatives stated that they would refer the borrower to a prime world bank that would provide collateral for the borrower's loans. The appellants represented the London Irish Bank to be such a bank. According to appellants, the collateral would take the form of "trust notes" which were similar to certificates of deposit. Armed with the "trust note" as collateral, the borrower would supposedly find conventional lenders ready, willing, and able to loan money for the contemplated project.

The appellants then informed prospective borrowers that they had to pay a fee to OIL to obtain this loan collateral. The fee was usually $25,000 to $35,000, although one borrower paid an advance fee of $120,000. The appellants told the borrowers that this fee did not go to OIL but instead was to be placed in an escrow account and would be paid to the bank when it issued the guarantee. The borrower was assured that the fee would be returned if he was unable to obtain a loan guarantee. OIL's reimbursement for its services was to come from a percentage of the funds advanced by the lender.

The terms of this agreement were set out in an ambiguously worded agreement called a "Mandate." The borrower also signed an "Agreement and Request for Loan Collateral." Upon receipt of the "Mandate," the "Loan Agreement," and the financial package, the London Irish Bank issued a guarantee called a "trust note."

The borrower then took the trust note to a lender to obtain a loan. At this point, the "chicken and egg" game began. None of the borrowers were able to obtain loans with the trust notes. Lenders expressed a variety of reasons for their refusal to make the loans. Some explained that the trust note was not a guarantee, but was a promise to provide a guarantee if the borrower obtained a loan commitment. The promise, however, was an empty one for a borrower would have no need for a guarantee *after* a loan commitment was obtained. Other lenders explained that the London Irish Bank refused to confirm the guarantee over the phone or that the London Irish Bank's reputation was poor.

Some victims then went to England to meet with bank personnel, McCaffery, Stafford, and, on occasion, Gleason. They gave a variety of responses to the borrowers' inability to obtain a loan: some borrowers were assured that a loan would be forthcoming; McCaffery refused to meet with other borrowers or disclaimed responsibility for their inability to obtain a loan.

Other borrowers returned to OIL. OIL followed a policy of not taking phone calls from the disgruntled borrowers. On the occasions when a borrower did contact an OIL representative, they insisted that the guarantees were viable and generally maintained that OIL had performed its obligations by supplying the guarantees. OIL refused to refund any of the advance fees.

At trial, the government proved through various bank and wire transfer records that the advance fees were never put in an escrow account but were instead diverted to appellants for their personal use.

Each appellant testified in his own defense. The basic thrust of the defense case was that the appellants made no knowing misrepresentations, did not participate in a conspiracy, and did not knowingly defraud the would-be borrowers. Appellants generally suggested that they were themselves "defrauded" in that they thought they were involved in legitimate business transactions. Appellants further suggested that Almeda, McCaffery, and

Stafford were exclusively responsible. Alternatively, appellants maintained that the scheme was in fact a viable, legitimate financing arrangement.

## II. THE INTERSTATE TRANSPORTATION COUNTS

Appellants argue that the evidence was insufficient to convict them of the interstate transportation counts. These counts charged appellants with the interstate transportation of securities, knowing the same to have been stolen, converted, or taken by fraud under 18 U.S.C. § 2314. These counts involve substantially identical facts.

In each count, the appellants induced clients of OIL to travel into Georgia for the purpose of delivering a check to OIL for the client's advance fee. The appellants accepted the checks and either deposited them in OIL's account or forwarded them to co-defendant McCaffery at the London Irish Bank. In each instance, the funds were not placed in an escrow account but were distributed among the defendants instead.

■ 18 U.S.C. § 2314 provides, in pertinent part:

> Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 2314. Appellants first note that the first paragraph of § 2314, unlike the second paragraph, does not employ the language "transports or causes to be transported." From this, appellants argue that they have been indicted for a "new offense" since the indictment charged them with causing the interstate transportation of securities obtained by fraud.

This argument has, however, been firmly rejected by the Supreme Court. In *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), the Court held that "[t]o constitute a violation of these provisions, it is not necessary to show that petitioners actually ... transported anything themselves; it is sufficient if they caused it to be done."

■ Appellants next argue that the transportation in interstate commerce had ceased before the checks were converted or taken by fraud. In particular, appellants note that the victims crossed state lines with the checks in their own possession. Appellants contend that any fraud or conversion of the checks was purely of an intrastate character.

In *McElroy v. United States*, 455 U.S. 642, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982), the Supreme Court held that under a related subsection of § 2314, an offender can be properly convicted of the interstate transportation of forged securities even if the forgery occurred after the security's movement across state lines. According to the Court, "Congress intended to proscribe the transportation of a forged security at any and all times during the course of its movement in interstate commerce, and ...", the stream of interstate commerce may continue after a state border has been crossed." *Id.* at 653–54, 102 S.Ct. at 1339. Thus, the Court concluded that the trial judge properly instructed the jury that the transportation of a forged security within the boundaries of a state violates § 2314 if the jury found the movement to be a "continuation of the movement that began out of state." *Id.* at 654, 102 S.Ct. at 1339.

Appellants attempt to distinguish *McElroy* by noting that it interpreted a different paragraph of § 2314. The operative language—"whoever transports in interstate or foreign commerce any [securities of a value over $5,000 or forged securities] knowing the same to have been [stolen, converted or taken by fraud or forged]"—is identical in both paragraphs. Thus, we perceive no sound reason for drawing the distinction sought by appellants.

■ Finally, appellants argue that the checks came to rest and that the interstate

movement of the checks stopped before the victims delivered the checks to the appellants in Georgia. However, we hold that the acceptance of the checks by defendants and the defendants' depositing of the checks into their accounts were a continuation of the interstate movement of the checks. The jury could reasonably have found that the acceptance and subsequent handling of the checks by defendants were a "continuation of the movement that began out of state." *McElroy, supra,* at 654, 102 S.Ct. at 1339.[2]

### III. IMPROPER CONDUCT BY THE TRIAL JUDGE

Appellants Gleason and Edwards argue that the trial judge denied them a fair trial by his actions and remarks made during the course of the trial. In particular, Gleason argues that the following series of questions by the trial judge cast aspersions upon Gleason and expressed the trial court's alleged opinion that Gleason was in fact guilty:

Court: Mr. Gleason, I don't think you have responded to the original question. How did you happen to get a copy of the search warrant?

Witness: I don't recall. I really don't. I'm of the opinion that Leo Roethe mailed it, but I don't know. I really don't know.

Court: Why would he mail it to you?

Witness: I had known him for a long time.

Court: People just don't go around mailing search warrants.

. . . .

Court: Just a minute. I thought your testimony a few moments ago was to the effect that the money was to be available for expenses.

. . . .

Court: But that instrument just said that the money was to be placed in escrow. How do you explain the difference?

. . . .

Court: Well, now, if the money was to be used for expenses how could it be refunded?

. . . .

Court: And what do you think that language means on the back of that exhibit to the effect the money is to be placed in escrow?

. . . .

Court: It's a what?

■■■ A trial judge is, however, more than a mere moderator and is under a duty to question witnesses and comment on evidence when it appears necessary. *United States v. Harris,* 720 F.2d 1259, 1260–61 (11th Cir.1983); *United States v. Bartlett,* 633 F.2d 1184, 1188 (5th Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 91 (1981).[3] The trial court may interrogate a witness to clarify his testimony or to insure that a case is fairly tried. *Manchack v. S/S Overseas Progress,* 524 F.2d 918, 919 (5th Cir.1975). On the other hand, a trial judge improperly interjects himself into the trial by questioning witnesses when the attorneys are competently conducting their cases. *United States v. Welliver,* 601 F.2d 203, 208–09 (5th Cir.1979); *United States v. Daniels,* 572 F.2d 535, 541 (5th Cir.1978). In *Welliver,* the trial court "repeatedly usurped the questioning of witnesses from counsel who were competently conducting the examination." *United States v. Welliver,* 601 F.2d at 208. The Fifth Circuit

---

**2.** Although it appears not to have been argued below, and we accordingly do not rely on it in reaching our decision, we note that the Supreme Court has held that the delivery of a check drawn on an out-of-state bank to a local bank for collection is sufficient to support a transportation conviction under § 2314 since "[i]t is common knowledge that such checks must be sent to the drawee bank for collection, and it follows that ... [the defendant] intended the ... [local bank] to send this check across state lines." *Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954).

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

held that "the cumulative effect of the many and manifest interventions by the trial judge deprived appellant of a fair trial." *Id.* at 208 n. 12.

■ In the instant case, we are not persuaded that the interventions of the trial court were so numerous or egregious as to require reversal. The trial below took approximately 10 weeks to complete. Appellant Gleason testified approximately three and one-half days. On direct and redirect he was asked approximately 350 questions. The government's cross and recross-examinations totalled over 1,500 questions. The trial judge asked Gleason 12 questions during his direct testimony and 33 questions during cross-examination. Considering the volume of the questions and their content, we conclude that there was not reversible error.

■ Gleason argues that the prosecutor's quotation of the judge's questions and Gleason's responses during the prosecutor's closing argument was improper. Gleason objected to the prosecutor's argument in the trial court, and the judge promptly instructed the jury that the judge's questions were "solely for the purpose of eliciting information and not to express ... [an] opinion or state any facts." The trial judge adequately informed the jury of the purpose and function of the court's questions.

■ Appellant Edwards also argues that he was denied a fair trial because the trial judge's comments and questions demonstrated the judge's belief in Edwards' guilt. First, Edwards argues that the tone of the questions asked by the trial judge indicated disbelief in Edwards' answers. Edwards, however, did not contemporaneously object to the trial court's alleged sarcastic manner. Thus, Edwards cannot argue "tone" that does not appear on a "cold record." *United States v. Robinson,* 635 F.2d 981, 984–85 n. 2 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981).

Edwards also contends that the following exchange between his attorney and the tri-

al judge amply demonstrates that he was denied a fair trial.

THE COURT: I think he is entitled to explain how he made a payment on Indian Cove. I think it is subject ... [to] attack by cross-examination. *It doesn't hold much water from my standpoint,* but I think he can explained [sic] that he paid $20,000 by using a portion of his fee to apply to it. You can ask him did he claim it for income tax purposes.

MR. PITTS: He never said he got it.

THE COURT: But if he took [a] $20,000 fee [that was] supposed to be paid to him and applied [it] to something else that's a receipt of money for tax purposes.

MR. PITTS: I understand ... that [it is].

THE COURT: *It sounds awfully fishy to me* but I think he can explain how he—

Without question, there would be a serious problem concerning the fundamental fairness of Edwards' trial if the italicized comments were heard by the jury. Edwards argues that "this all transpired in front of the jury," but he fails to point out that the comments were made during a bench conference and not in open court.

■ Our research discloses only one case dealing with such a problem. In *Harris v. United States,* 367 F.2d 633, 636 (1st Cir.1966), *cert. denied,* 386 U.S. 915, 87 S.Ct. 862, 17 L.Ed.2d 787 (1967), the defendant alleged that disparaging remarks addressed to his attorney during a bench conference denied him a fair trial. There, the court held that since the defendant made no showing that the remarks were heard by the jury, he was not entitled to relief. Similarly, Edwards has made no such showing in the instant case. Thus, we are unable to say that the remarks so prejudiced Edwards as to deny him a fair trial.

■ Finally, Edwards points to one other comment of the trial court as indicative of bias.

Q: Didn't Judge Irwin Fleet find—didn't —it was paid back by October 12 of '79?

A: That's correct.

Q: That's why your daughter sued you, her very own father, ... for payment of the money and on December the 10th of 1980, a judge from the Circuit Court of Okaloosa County, Florida, entered a judgment against none other than ... Robert D. Edwards that read, didn't it, "It is the judgment of this court that ... the accomodation endorser—"

. . . .

Q: Irwin Fleet, is he a judge?

A: A very fine judge.

Q: A real judge?

A: I don't know whether you consider Florida in the union or not, Mr. Weintraub. If you do it's—

THE COURT: All right, Mr. Edwards, no smart-ass remarks.

The trial court's comment was certainly improper, but, upon later objection, the trial court itself recognized the impropriety and gave a corrective instruction to the jury. Thus, we are unable to conclude that Edwards was prejudiced thereby.

We also note that on numerous occasions the trial court instructed the jury that it was not to regard the court's questions or statements as in any way reflective of an opinion on the part of the trial judge or as reflective of the guilt or innocence of the defendants. The trial court instructed the jury that "when I ask questions solely for that purpose, to elicit information, you shouldn't consider any statement that I might have made in that respect as expressing any opinion on my part as to the testimony of the witness or as to the guilt or innocence of any defendant." Appellants argue that the corrective instructions were not "strongly worded enough to unweave the web of prejudice," but we are of the opinion that there was little, if anything, more that the trial court could have done to inform the jury of the proper function and purpose of the court's questions.

Appellants make numerous other arguments, all of which are without merit and do not warrant discussion. Accordingly, the decision of the district court is

AFFIRMED.