**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John CHRISTO, Jr.,
Defendant-Appellant.**

No. 79–5307.

United States Court of Appeals,
Fifth Circuit.

March 24, 1980.

Rehearing and Rehearing En Banc
Denied May 27, 1980.

Wilfred C. Varn, E. C. Deeno Kitchen, Tallahassee, Fla., Dempsey J. Barron, Panama City, Fla., Robert M. Ervin, Tallahassee, Fla., for defendant-appellant.

Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., Donald S. Modesitt, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before MORGAN, RONEY and GARZA, Circuit Judges.

GARZA, Circuit Judge:

At all times pertinent to this case, John Christo, Jr. was Chairman of the Board and majority stockholder of Bay National Bank & Trust Company (BNBT) and the First National Bank of Panama City, Florida (First National). On October 12, 1978 a twenty-nine count Indictment was returned against him charging twenty-one counts of "misapplication of bank funds" contrary to 18 U.S.C. § 656[1] and 12 U.S.C. § 375a;[2] six counts of making or causing to be made "false statements" contrary to 18 U.S.C. § 1001; and two counts of making or causing to be made "false entries" contrary to 18 U.S.C. § 1005. After a trial by a jury, Christo was acquitted on all counts charging "false statements" and "false entries"

and three counts of "misapplication of bank funds." Christo appeals, on several grounds, his convictions of the eighteen counts on which he was convicted. Seventeen of the counts involve overdrafts of his personal checking accounts at First National (Count III) and BNBT (Counts IV–XIX). The last count (Count XXVIII) involves a loan of $150,000 to Balbi Corporation (Balbi). The factual circumstances of each count are briefly stated below.

Count III: On June 7, 1974 a BNBT employee drafted a debit memorandum for $35,000 on Christo's personal account at First National. Christo's personal account at First National was without sufficient funds to pay the debit memorandum but First National Vice President, James Rider, approved an overdraft of the account and the debit memorandum was honored at First National and the funds were disbursed to BNBT for deposit in Christo's personal account there. In August, 1974 a $35,000 deposit was made by Christo to clear the overdraft at First National.

Counts IV–XIX: During the period of March 15, 1974 through May 16, 1975, Christo wrote checks on his personal account causing overdrafts which at one point reached a maximum of $81,116.19. Each of these overdrafts were brought to Christo's attention by BNBT employees and each was

1. 18 U.S.C. § 656 provides:
 § 656. Theft, embezzlement, or misapplication by bank officer employee.
 Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both; . . .

2. 12 U.S.C. § 375a provides:
 § 375a. Loans to executive officers of bank.
 (1) General prohibition; authorization for extension of credit; conditions for credit. Except as authorized under this subsection, no member bank may extend credit in any manner to any of its own executive officers. No executive officer of any member bank may become indebted to that member bank except by means

of an extension of credit which the bank is authorized to make under the subsection.
 * * * * * *
 (4) General limitation on amount of credit. A member bank may make extensions of credit not otherwise specifically authorized under this subsection to any executive officer of the bank, not exceeding the aggregate amount of $5,000 outstanding at any one time.
 * * * * * *
 (7) Endorsement of guarantee of loans or assets; protective indebtedness. This subsection does not prohibit any executive officer of a member bank . . . from incurring any indebtedness to the bank for the purpose of . . . giving financial assistance to it.
 The provisions of Title 12 U.S.C. § 375a quoted above are as they existed during the relevant periods of the Indictment. Title 12 U.S.C. § 375a was amended by the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L.No.95–630, § 110, 92 Stat. 3665.

paid by Christo at that time. The overdrafts were never concealed and always appeared on the BNBT records. Regarding these overdrafts as well as that in Count III, it was the policy of those banks to honor overdrafts of credit-worthy customers[3] and that overdrafts larger than those here involved were regularly permitted by BNBT. It is undisputed that overdrafting by bank "insiders" is a common practice within the banking industry.

Appellant-Christo's last overdraft occurred May 16, 1975 and was paid by him May 30, 1975. The first criticism of these overdrafts came from a bank examiner in November, 1975 during a bank examination of BNBT. Shortly thereafter, on December 2, 1975, Christo paid BNBT interest at the maximum lawful rate for all of his overdrafts occurring in the three proceeding years. Christo never again overdrafted.

Count XXVIII: This count arises from a loan to Balbi Corporation which was owned by Charles A. Whitehead (47.5%), John Christo (5%), John Christo's immediate family (42.5%) and William E. Welliver (5%). In July, 1973, Balbi purchased a 158 acre tract of land and gave a note in payment. The initial payment on the note came from proceeds of a loan to Balbi by way of an overdraft of an account at BNBT on July 24, 1974. The check creating the overdraft was signed by Charles Whitehead, President of Balbi.

On October 2, 1974, Balbi borrowed $150,000 from First National Bank of Fort Walton (Fort Walton) and paid the overdraft plus 10% interest to BNBT. The note securing this loan was executed by Charles Whitehead and Christo gave his personal guaranty. On February 3, 1975, a Fort Walton bank officer telephoned Welliver, BNBT President, requesting payment of the Balbi note. After consulting with Christo as to whether BNBT was authorized to lend Balbi funds,[4] Welliver authorized a transfer of BNBT funds in the amount of $151,320.31 to Fort Walton via Florida First National Bank in Jacksonville, Florida—a bank at which both BNBT and Fort Walton had correspondent accounts. The amount transferred represented Balbi's full indebtedness to Fort Walton. On February 28, 1975 BNBT received its month-end reconcilement statement from Florida First National and the $151,320.31 charge was entered upon BNBT's reconcilement ledger. On August 4, 1975, Balbi again arranged financing through Fort Walton and paid the BNBT loan together with 8.75% interest.

### THE INDICTMENT

Except for Count 28, the government's theory of misapplication of bank funds centers upon violations of 12 U.S.C. § 375a (as it existed at the time of indictment), a civil regulatory banking statute, which generally prohibits a bank from extending credit in excess of $5,000 to one of its executive officers. The indictment and government's case at trial contended that each overdraft which caused or contributed to a negative bank account balance in excess of $5,000 amounted to a violation of 12 U.S.C. § 375a and that these civil violations constituted a criminal misapplication of bank funds under 18 U.S.C. § 656. No one disputes that a civil violation of 12 U.S.C. § 375a may have occurred, but Christo's first argument at trial and now on appeal is that an indictment may not charge nor the government prove violations of a civil regulatory statute as the sole basis for alleged criminal misapplications of bank funds. Specifically, Christo contends that the trial court erred in denying his timely motions for dismissal and for judgments of acquittal on Counts III through XIX of the indictment. In support of his argument, Christo relies upon

---

**3.** The record reveals that these overdrafts were not disproportionate to Christo's personal wealth which exceeded six million dollars at the time. In addition, Christo had resources available to him at BNBT and First National far in excess of the overdraft balance including undistributed profits of the bank, unpaid salary, insurance agency and profit sharing accounts.

**4.** As Chairman of the Board of BNBT, Christo was empowered by BNBT By-Laws to grant loan authorizations.

*U. S. v. Britton*, 107 U.S. 655, 2 S.Ct. 512, 27 L.Ed. 520 (1882), which interprets the statutory predecessor of 18 U.S.C. § 656. In *Britton*, the Supreme Court held that to constitute the element of "willful misapplication" there must be a conversion of bank funds to the use, benefit or gain of the party charged or a third party. The indictment in *Britton* alleged that the bank president had borrowed bank funds, purchased bank stock with those funds, and held the stock in his name in trust for the use and benefit of the bank. The Court held that the indictment was insufficient to charge an offense where it expressly negated the requisite *mens rea* through factual averments. The *Britton* indictment therefore charged only a maladministration of the affairs of the bank rather than criminal misapplication of its funds. 107 U.S. at 666–667, 2 S.Ct. at 521–522.

■ Christo correctly concludes from *Britton* that bank funds are not criminally misapplied merely because they are applied in a manner unauthorized or prohibited by the Federal banking statutes, but he erroneously concludes that criminal misapplication and civil violations of maladministration must be mutually exclusive occurrences. There is nothing in *Britton* which compels this conclusion.

■ The indictment counts against Christo [5] allege the four essential elements of criminal misapplication and the overdraft method by which these elements were allegedly accomplished. The recitation of violation of 12 U.S.C. § 375a neither adds to the charges of misapplication or detracts from the substance of the charge. Under § 656, as applicable here, the indictment must allege and the government must prove beyond all reasonable doubt that (1) the accused was an executive officer of a bank, (2) that the bank was connected in some capacity with the Federal Reserve System, (3) that the accused willfully misapplied the funds of that bank, and (4) that the accused acted with intent to injure and defraud that bank. See *U. S. v. Welliver*, 601 F.2d 203, 207 (5th Cir. 1979). If the government can prove these elements, it matters not that the methods by which the misapplication occurs may also violate a civil regulatory statute. Therefore, we conclude that Counts III through XIX of the indictment were sufficient to charge an offense under 18 U.S.C. § 656.

## THE INSTRUCTION

In the event the indictment is sustained, Christo argues in the alternative that the trial court committed plain error by instructing the jury that arguable violations of § 375a could serve as the factual basis for a criminal misapplication conviction regarding Counts III through XIX. In the initial summary of issues the trial court instructed the jury regarding § 375a as follows:

> Count III charges the Defendant with having obtained a loan of $35,000 from the First National Bank of Panama City, *which loan was in excess of $5,000*, which is a limitation, the Government says, placed on monies to officers or directors by the provisions of Title XII, United States Code, Section 375a.

---

5. Count IV, typical of Counts III through XIX, reads as follows:

> On or about March 25, 1974, in the Northern District of Florida, JOHN CHRISTO, JR., being a Director and Chairman of the Board of Directors and Executive Officer of the Bay National Bank and Trust Co., Panama City, Florida, a member bank of the Federal Reserve System, with intent to injure and defraud The Bay National Bank and Trust Co., Panama City, Florida, did willfully and knowingly misapply and cause to be misapplied monies and funds of the said bank in the amount of $6,486.13 by fraudulently causing to be disbursed $6,486.13 from The Bay National Bank and Trust Co.,

Panama City, Florida, in payment of a check, to wit:

> Personal Check Number 1883, dated March 15, 1974, payable to Central Bank & Trust Company, in the amount of $6,486.13

drawn upon the personal checking account of JOHN CHRISTO, JR., at The Bay National Bank and Trust Co., Panama City, the payment of the said check by The Bay National Bank and Trust Co., Panama City, Florida, resulted in an overdraft of said personal checking account of JOHN CHRISTO, JR., in excess of $5,000.00, all of the above was done in violation of Title 18, United States Code, Section 656 and Title 12, United States Code, Section 375a.

It is the contention of the Government under Count III that the loan was used to overdraft in the Defendant's account in the Bay National Bank. *The Government contends that this loan made to the Defendant in excess of $5,000 constitutes a misapplication of funds with intent to injure the bank under the provisions of Title—Section 656.*

Counts IV through XIX, all under the same section, are the ones dealing with the overdrafts that we have heard so much about. And the Government claims in these counts that these overdrafts were all in *excess of $5,000, and that if they are considered as loans to the Defendant, that they are loans in violation of the $5,000 limitation of Section 375 [375a], and that therefore constitute a misapplication of funds with intent to injure and defraud the bank under the provisions of Section 656.* (emphasis added)

In more detailed instructions to the jury, the Court stated:

Now, furthermore, you *must view these overdrafts in light of the restrictions* contained in the section that I referred to a few moments ago but have not read to you, and that is Section 375a of Title XII. Now, the *pertinent* part of that statute, and I quote:

"A member bank may make extensions of credit not otherwise specifically authorized under this section to any executive officer of the bank not exceeding the aggregate amount of $5,000 outstanding at any one time." *Now, if you find that the overdrafts of the Defendant in this case were informal loans on which it was understood at the time of the overdrafts that interest was to be paid, then you must decide whether those loans were made in violation of the $5,000 limitation placed on loans to executive officers by the provisions of Section 375a.* Bear in mind that Section 375a does not provide for any criminal penalties. *But you may decide*, if you conclude that the evidence justifies it, *that the violation of 375a*, that is if there are a series of loans made in *violation of the $5,000 limitation*, you

may decide and must decide from the evidence whether or not those loans taken individually or cumulatively *constitute a willful disregard for the welfare of the bank, and, as such, a misapplication of funds which, if accompanied by an intent to injure or defraud, would constitute a criminal violation under Section 656.* (emphasis added)

Appellant-Christo argues that the instructions erroneously defined the legal standard of guilt under the willful misapplication statute in that the jury was instructed to consider Section 375a as an alternative standard of guilt. He contends that, regardless of a favorable jury finding of the propriety of the overdrafts as valid extensions of credit, the jury was instructed to decide whether the overdrafts constituted criminal misapplication since those extensions of credit exceeded the $5,000 lending limitation of § 375a. Furthermore, he argues that the jury was allowed to infer criminal intent merely from the violation of Section 375a. Lastly, he argues that the numerous references in the indictment, the government's evidence and argument, and the Court's instruction regarding violation of a civil statute all confused the jury and clouded the issue as to guilt or innocence under the criminal misapplication charges.

In support of his contentions, Christo draws our attention to *Britton, supra,* and *U. S. v. Steinman,* 172 F. 913 (3d Cir. 1909). In *Britton* the Supreme Court initially drew the distinction between willful misapplication and official maladministration. In *Steinman* the Third Circuit held, in a case involving overdrafts, that it was reversible error for the trial court to instruct the jury that unlawful acts of maladministration (the overdrafts in *Steinman* exceeded the lending limitations set forth in Reg.Stat. 5200, now 12 U.S.C. § 84) evidenced an intent which warranted conviction under the misapplication statute. "Now this distinction between an unlawful act of maladministration, which, of course, misapplied the funds of the bank and subjected the bank to forfeiture of its charter, but which were not punishable under section 5209

[now 18 U.S.C. § 656] as a willful misapplication, the court in its charge failed to draw, but, on the contrary, instructed the jury that such an unlawful act of maladministration evidenced an intent which warranted conviction." *Steinman* at 916.

In our discussion above concerning the sufficiency of the indictment, we held that, as long as the essential elements of criminal misapplication under § 656 are pled and proven regarding the defendant's acts, it simply does not matter that the same acts might violate the regulatory prohibitions of § 375a. Keeping this fundamental premise in mind, we now find it necessary to add that the inclusion of § 375a violations in this case were legally irrelevant and we have no choice but to hold that the instructions, indeed the whole tenor of the trial, were plain error and will require reversal.

A conviction, resulting from the government's attempt to bootstrap a series of checking account overdrafts, a civil regulatory violation, into an equal amount of misapplication felonies, cannot be allowed to stand. The government's evidence and argument concerning violations of § 375a impermissibly infected the very purpose for which the trial was being conducted—to determine whether Christo willfully misapplied bank funds with an intent to injure and defraud the bank, not whether Christo violated a regulatory statute prohibiting the bank from extending him credit in excess of $5,000. The trial court's instructions and emphasis on § 375a served only to compound the error by improperly focusing the jury's attention to the prohibitions of § 375a. After examining the record of the trial, one questions whether Christo was found guilty of willful misapplication with intent to injure and defraud the bank or whether he was given eighteen concurrent 5-year sentences and fined $90,000 for overdrafting his checking account.[6]

We therefore hold that upon retrial of the overdrafting counts of this case, the government will have to present the requisite facts amounting to criminal misapplication, in the same manner as the hundreds of cases previously tried in our federal courts, and its case against Christo will have to stand on its own hind legs unaided by any prejudicial reference to violations of § 375a.[7]

## SUFFICIENCY OF THE EVIDENCE

Appellant-Christo attacks the convictions on Counts III through XXVIII on the grounds that the evidence presented was legally insufficient to establish violations of § 656. On Counts IV through XIX, Christo argues that the proper legal standards, as determined by prior case law, compel a conclusion that lawfully debited and paid overdrafts can not constitute a criminal misapplication. Regarding Count III, in addition to the legal sufficiency issue, Christo argues that the evidence fails to link him with either the debit memo drawn at BNBT or with the overdraft occurrence at First National. The evidence on Count XXVIII, he argues, evinces no more than a *bona fide* financing transaction between BNBT and Balbi.

In support of his theory of legal sufficiency on Counts III through XIX, Christo cites an array of misapplication cases under § 656 from virtually every circuit which involve defalcation through deception, artifice or concealment methods and he argues that absence of these methods from this

---

6. This Court finds it interesting to note that, of the 29 count indictment, only those counts involving § 375a resulted in guilty verdicts with the sole exception of Count XXVIII, the Balbi transaction.

7. To the extent that 12 U.S.C. § 375a appears in the indictment it is surplusage and should be stricken. Because § 375a will play no part in the retrial of this case, the point of error addressed to the trial court's refusal to instruct the jury on the statutory defense exception under § 375a(7) has become moot. However, this should in no way preclude pertinent testimony of Robert Schwind, John Christo, III, or others regarding the purposes and effects of overdrafting in the banking industry. This evidence should remain highly relevant on the issues of whether misapplication occurred as well as intent. Nor should the elimination of § 375a necessarily preclude Christo's Requested Instructions # 29 and 32.

case precludes the possibility of willful misapplication. Typical of these cases is the discussion of the misapplication statute by Judge Friendly in *United States v. Docherty*, 468 F.2d 989 (2d Cir. 1972):

Willful misapplication has been found, for example, when a bank employee knowingly engaged in a check 'kiting' scheme for the benefit of depositors; when a bank employee paid money out to a customer on a check he knew was backed by insufficient funds and then concealed the overdraft; when a bank officer loaned money without security knowing that the borrower could not repay; when a depositor repeatedly overdrew his account, knowing that the branch manager was consistently ignoring this; when a bank officer caused his bank to borrow from another and pocketed the proceeds, leaving his own bank only with a personal note of an employee of the lending bank which he had no reason to think would be paid; and . . . when a bank officer pocketed the proceeds of loans knowingly issued on the strength of fraudulent loan applications. (citations omitted) *Docherty* at 994.

In addition to the misapplication case law, Christo points out the particular circumstances of his case, the practice of BNBT's and First National's policy of honoring overdrafts of credit-worthy customers in cases involving larger checks than those here involved, and the practice of the banking industry in general which shows that, of the banks similar in size to BNBT, almost 50% had overdrafts by insiders and of these banks 92% charged no interest on the insider's overdrafts.

In support of its position, the government does not cite, nor is this Court aware of, even one case upholding a conviction for willful misapplication involving unconcealed checking account overdrafting by a bank officer or employee. Instead, the government contends that concealment was unnecessary since Christo was the most powerful

person in the bank and that the overdrafts, even if known by all, had a natural tendency to injure the banks since large amounts of money were paid out without having any legally binding obligation for repayment.

■ Without passing upon each point of these arguments, we are compelled to correct a mistake of law which was presented to the jury through the government's argument. Overdrafts, such as those involved here, do not leave a bank in the situation of having paid out money without a legally binding obligation for repayment. The Uniform Commercial Code, Fla.Stat. § 674.-4–401 (1977), as well as other Code sections, not only creates an obligation between the drawer of the overdraft check and the payor bank, but also provides remedies for collection either on the check itself, on the money itself, or upon the obligation for which the check was drawn. In other words, the bank may enforce the debt created by the overdraft in the same manner as any loan or promissory note would be enforced. On retrial, a general jury instruction on this issue would be helpful to eliminate any misimpression that the bank's ability to collect the overdraft amounts was entirely dependent upon Christo's voluntary repayment.

■ Regarding the government's position concerning necessity of concealment, we agree that the traditional cases of misapplication have never held the particular method of misapplication to be a necessary element of proof. On the other hand, a case of insider overdrafting has never been held to constitute willful misapplication. In fact, the only known case of § 656 misapplication mentioning § 375a has dealt with artifice and deception, the purpose and design of which would have a natural tendency to injure the bank.[8] No case has held, however, that the mere absence of deception, artifice or concealment in a case of insider overdrafting would constitute a de-

---

8. In *U. S. v. Krepps*, 605 F.2d 101 (3d Cir. 1979), the Third Circuit held that the evidence was sufficient to find "willful misapplication with intent to injure and defraud" where a

bank officer secures loans to himself through the inherently fraudulent subterfuge of having the bank loan monies to several named debtors who then transferred the funds to him.

fense where the facts otherwise demonstrate a willful misapplication with intent to injure and defraud. In any event, such facts would have to be evaluated on a case by case basis. In this case, while the evidence might have been sufficient to support the guilty verdicts on Counts IV through XIX, the trial of those counts was infected by incorrect theories of culpability and, therefore, we are unable to hold, as a matter of law, that the evidence was insufficient to support the jury verdict.

As previously mentioned, in addition to the legal sufficiency issue, Christo attacks the conviction on Count III on the grounds that the record is devoid of evidence connecting Christo to the $35,000 debit memorandum issued from BNBT to his account at First National. The evidence shows that the BNBT employee who drafted the debit memorandum was prompted by the actions of BNBT President, William E. Welliver. Similarly, the First National employee who honored the debit memorandum gave no indication that Christo had any involvement with the decision to pay the debit memorandum.

 At best, the government's case against Christo on Count III is circumstantial. In this circuit, the test for reviewing a conviction based on circumstantial evidence is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt. Clearly, even under the theory on which this case was first tried, the jury could not properly find or infer beyond a reasonable doubt that Christo was guilty. Therefore, we order that Count III be dismissed.

Regarding Count XXVIII, the Balbi transaction, Christo argues that a provable debt existed from Balbi; that Balbi was a credit-worthy borrower with ample collateral; that the loan was never concealed; that principal and interest were repaid and therefore the evidence was insufficient as a

matter of law to sustain the conviction. The thrust of the government's argument is the absence of any document to evidence the $150,000 indebtedness of Balbi to BNBT. Furthermore, the government argues that the same evidence and witnesses presented against Christo were presented against William Welliver at his trial concerning the same occurrence and therefore, since the Welliver conviction was sustained on these grounds,[9] although his conviction was reversed on other non-evidentiary grounds, so should this conviction be sustained.

 In addressing this issue we must point out that the culpability of Welliver in no way controls the present conviction. Welliver was an *operating* officer of BNBT and as such an officer he was personally responsible for the accounting procedures used by BNBT in the Balbi loan. The fact that Welliver's acts amounted to false entries and misapplication do not necessarily inculpate Christo. Perhaps the government can prove that Christo's acts were so inextricably intwined with those of Welliver that both were culpable for those acts. On the other hand, Christo may be able to show that his involvement amounted to no more than what he was legally entitled to do at the time—to authorize a loan to a corporation in which he and his family held a substantial interest. In view of the fact that the jury improperly considered the role of § 375 as it applies to loans to bank insiders and the fact that Welliver's conviction, prior to his successful appeal, was brought to the jury's attention, we feel that a retrial of Count XXVIII is necessary.

## CEASE AND DESIST ORDERS

 In order for a proper retrial of this case, we find it necessary to address one last issue.[10] During the trial, the government repeatedly attempted to introduce

---

9. *U. S. v. Welliver*, 601 F.2d 203 (5th Cir. 1979).

10. Since this case will be retried, the point of error directed towards the quashing of the subpoena duces tecum to John Heimann, because of the trial delay which would occur in its

enforcement, has become moot. We trust that noncompliance with this subpoena or others will be promptly called to the attention of the trial judge in order that he may take remedial action.

certain Cease and Desist Orders issued by the Comptroller of the Currency against BNBT. Defense objections based on irrelevance and prejudice were generally sustained. However, the jury heard the government prosecutor refer to or solicit questions concerning the Cease and Desist Orders no less than eight different times. Although not a part of the record on appeal, government counsel was given an opportunity to justify the relevance of this otherwise prejudicial trial conduct. Despite our several questions directed to him on this issue, government counsel demonstrated he did not even know the dates or content of these orders much less the relevance of them and consequently affirmed our suspicions that just enough was said to poison the well. Defense counsel stated that these orders were issued subsequent to the dates charged in the indictment. We cannot condone this sort of trial tactic nor do we feel that the trial court's instruction adequately cured the impact on the jury. Standing alone, the prejudicial effect of these orders on the jury would require reversal. In the event government counsel desires to use Cease and Desist Orders in its case, the trial court should conduct a hearing, outside the presence of the jury, to determine the relevance, if any, of these orders and weigh that relevance against their highly prejudicial nature. Without such a hearing, we suggest that government counsel carefully refrain from reference to these orders upon retrial.

REVERSED and RENDERED as to Count III and REVERSED as to the other counts in the indictment for a new trial in accordance with this opinion.