United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 25, 2005**

Charles R. Fulbruge III
Clerk

REVISED NOVEMBER 8, 2005
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 04-10364

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

THOMAS CAMPBELL BUTLER, MD,

Defendant-Appellant.

Appeal from the United States District Court
For the Northern District of Texas, Lubbock Division

Before WIENER, DeMOSS, and PRADO, Circuit Judges.

PER CURIAM:

Appellant Dr. Thomas Butler was convicted on 47 of 69 counts of various criminal activity relating to work he performed as a medical researcher at the Texas Tech University Health Sciences Center ("HSC"). Of these 47 counts, Butler was convicted of 44 counts of contract-related crimes, including theft, fraud, embezzlement, mail fraud, and wire fraud, (collectively, the "Contract Counts"). Butler was also convicted of three counts relating to the transportation of human plague bacteria ("*yersinia pestis*" or "YP"), including the illegal exportation of YP to Tanzania, the illegal transportation of hazardous materials, and

making a false statement on the waybill accompanying the YP vials shipped to Tanzania, (collectively, the "Plague Counts"). The district court sentenced Butler to 24 months' imprisonment followed by 3 years' supervised release, a $15,000 fine, and ordered him to pay restitution to HSC in the amount of $38,675. Butler timely filed the instant appeal. For the reasons discussed below, we affirm.

**BACKGROUND AND PROCEDURAL HISTORY**

Butler was a professor and Chief of Infectious Diseases in HSC's Internal Medicine Department since 1987. As part of Butler's pay structure, a percentage of his income was provided by the State of Texas while the remainder came from the Medical Practice Income Plan ("MPIP"). Under MPIP, a doctor earned money by seeing patients, receiving research grants, or conducting clinical studies under the auspices of HSC. The monies received from the patients a doctor treated and the funds paid out for the research/studies was remitted to HSC. Part of these monies paid for HSC's overhead costs and other expenses while another part was paid out as the non-state portion of the doctor's income. Any remaining funds from a clinical study was transferred to a developmental account for the researcher's department or division. The money in this account was earmarked for expenses such as professional dues and business travel, none of which was related to any particular project.

When a researcher at HSC was in a position to obtain a

2

research grant or conduct a clinical study, it was required that the accompanying documentation be submitted to the institution for approval. Moreover, any monies paid out as a result of the research grant or clinical study were required to be paid directly to the institution. Consulting contracts, however, received different treatment from research grants or clinical studies. Specifically, a consulting contract was viewed by HSC as a means for a doctor to sell his or her expertise or advice directly to a third party, such as in designing a drug study. The consulting would not involve patient care or patient safety issues, and the consultant would not be using HSC's resources such as labs and personnel. Because of these considerations, consulting contracts were permissible without HSC's financial involvement or approval, unlike contracts covering clinical studies.

Between 1998 and 2001, Butler entered into several clinical study contracts with two different pharmaceutical companies, Pharmacia and Chiron. The first contract entered into with Pharmacia occurred in March 1998. Under this contract, Pharmacia agreed to pay HSC $2,400 for each patient enrolled in the clinical study. Apparently unbeknownst to HSC, however, Pharmacia and Butler entered into another "shadow" or "split" contract that provided Butler with an additional $2,400 per patient enrolled in the same study. A similar contract was entered into between Pharmacia and Butler in the spring of 2000 and again in the fall of 2000.

3

With respect to the contract in the fall of 2000, there was another HSC researcher, Dr. Casner, who was working on the same study as Butler. Dr. Casner's contract with Pharmacia was not split, and therefore it appeared that he had a budget twice the size of Butler's. A representative with HSC who was aware of Dr. Casner's contract, contacted Butler to inform him that she could get Butler a bigger budget. Butler allegedly refused the offer and informed the HSC representative that he would remain in charge of negotiating his own contracts. Butler had also negotiated two similar contracts with Chiron (another pharmaceutical company), using the contracts with Pharmacia as a template. The contracts with Chiron involved drug studies that were conducted in February 1999 and March 2000.[1] Butler received payments under the contracts with Pharmacia and Chiron until August 2001.

The existence of the shadow contracts first came to the attention of HSC in July 2002, when an HSC representative learned from a Pharmacia representative that Butler was getting one-half of the money from the Pharmacia studies, while HSC received the other half. HSC initiated a preliminary investigation into the split contracts that continued until January 9, 2003, when HSC informed Butler by letter that an additional investigation by authorities charged with compliance issues was to begin. In the letter, HSC sought a response from Butler by no later than January 21, 2003.

---

[1] By all accounts, Butler was the only researcher to have split contracts with these pharmaceutical companies.

4

For the reasons discussed below, HSC never received the requested response.

In addition to his work at HSC in Texas, Butler conducted plague research in Tanzania in 2001.[2] Then, in April 2002, Butler returned to Tanzania where, for approximately 10 days, he worked on research of plague in human patients at clinics there. Part of his research involved personally culturing and subculturing specimens that he planned to bring back to the United States for additional studies.

Having returned to the United States with the *yersinia pestis* cultures, Butler continued his research. Then, on January 13, 2003, four days after receiving the letter from HSC auditors warning of the impending investigation into the alleged shadow contracts, Butler reported that 30 vials of the *yersinia pestis* were missing from his HSC laboratory in Lubbock. The FBI was immediately notified and within hours descended upon Lubbock, where Butler was questioned. Eventually, Butler revealed that the *yersinia pestis* was not actually missing, but that he had destroyed the vials accidentally.

In April 2003, a grand jury returned a 15-count indictment charging Butler with various crimes relating to his transporting of *yersinia pestis*, the providing of false statements to FBI agents

---

[2] This work was reportedly encouraged by the Food and Drug Administration (the "FDA"), the Center for Disease Control and Prevention ("CDC"), and the United States Army.

regarding *yersinia pestis*, and a tax crime. A superceding indictment was returned by the grand jury in August 2003, in which Butler was charged with 54 additional criminal counts, including mail fraud, wire fraud, and embezzlement that arose out of Butler's agreements with the pharmaceutical companies and the Food and Drug Administration (the "FDA"). Butler filed a motion seeking to sever the Contract and Plague Counts, which the district court denied. After a three-week trial in November 2003, the jury returned a mixed-verdict against Butler, finding him guilty on most of the Contract Counts and not guilty on most of the Plague Counts and the tax count. On March 10, 2004, the district court sentenced Butler to 24 months' imprisonment, three years' supervised release, $15,000 in fines, and a $4,700 special assessment. Butler was also ordered to pay HSC restitution in the amount of $38,675. Butler timely filed the instant appeal.

## DISCUSSION

### I. Whether the district court erred by not severing the Contract Counts and the Plague Counts.

On appeal, Butler argues the Federal Rules of Criminal Procedure and this Circuit's case law prohibit the joinder of unrelated criminal categories charged; here, the Contract Counts and the Plague Counts. Butler contends that trying all the counts together caused him prejudice. Conversely, the Government maintains that joinder was proper because the charges in the superceding indictment were linked as transactions within a common

6

scheme or plan.

We review a district court's denial of a motion to sever for an abuse of discretion. United States v. Booker, 334 F.3d 406, 415 (5th Cir. 2003). Whether the initial joinder of charges was improper under Rule 8 of the Federal Rules of Criminal Procedure is judged according to the allegations in the superceding indictment. See United States v. Kaufman, 858 F.2d 994, 1003 (5th Cir. 1988). Specifically, Rule 8(a) provides that:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

FED. R. CRIM. P. 8(a).

Butler argues that the superceding indictment alleges no connection between the groups of allegations, or any rationale for suggesting that the Contract Counts were based on the same conduct or motivation as the Plague Counts. Butler maintains the two sets of counts are neither connected nor constitute parts of a common scheme or plan. In support of his contention, Butler cites to several cases in which this Court and some district courts have identified improperly joined charges. See, e.g., United States v. Diaz-Munoz, 632 F.2d 1330 (5th Cir. 1980); United States v. Lynch, 198 F. Supp. 2d 827 (N.D. Tex. 2001); United States v. Braig, 702 F. Supp. 547 (E.D. Pa. 1989). None of these cases, however, are particularly instructive. The counts involved in each of the cases

7

cited by Butler were not tied in any meaningful way to each other. In contrast, the superceding indictment in the instant case sufficiently sets forth how Butler's handling of plague bacteria as part of his research efforts was ultimately related to his scheme to defraud HSC by concealing both his contracts with the FDA and the split contracts Butler maintained with the two pharmaceutical companies.

As a preliminary matter, we broadly construe Rule 8 in favor of initial joinder. United States v. Fortenberry, 914 F.2d 671, 675 (5th Cir. 1990) (citation omitted). This Circuit has also recognized that the transaction requirement in Rule 8 is flexible, holding that such a transaction "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." Id. (quoting United States v. Park, 531 F.2d 754, 761 (5th Cir. 1976)).

The superceding indictment sets out such a relationship, identifying HSC's need to generate funding through studies conducted by its researchers, including Butler. The indictment specifically outlines Butler's research into non-plague-related diseases for Pharmacia and Chiron and his plague-related research for the FDA.[3] The indictment's description of Butler's scheme to defraud explained how he failed to disclose material facts to HSC

---

[3] The Government also points out that the superceding indictment reveals how the success of Butler's efforts to secure his clinical study contracts depended in large part on his plague research.

regarding not only the Pharmacia and Chiron contracts, but also the plague-related contracts with the FDA.

The introduction to the superceding indictment details how the FDA offered research opportunities to medical professionals regarding "the development and review of medications for the prevention and treatment of illness that could be caused by terrorists using biological agents." The FDA subsequently purchased Butler's professional service, and specifically, according to the indictment, "for the results of experimental research regarding the post-antibiotic effect of drugs on the microorganism *Yersinia pestis*," and later "to provide experimental results from [Butler]'s laboratory about the post-antibiotic effect of drugs on various strains of *Yersinia pestis* isolated from plague patients in Tanzania."

Meanwhile, the actual FDA fraud counts charged Butler with attempting to conceal the existence of his FDA contracts from HSC's administrative review and approval process. Butler was alleged to have subsequently obtained payments from the FDA without distributing any monies therefrom to HSC in accordance with HSC's relevant policies for doing so.

The superceding indictment clearly sets forth an alleged common scheme that connects both Butler's plague research and the Pharmacia/Chiron pharmaceutical contracts to the FDA fraud counts. In doing so, the  superceding indictment, on its face, creates an

9

overlap that logically intertwines the Contract Counts with the Plague Counts.

Even if this panel were to question the initial joinder of the Contract Counts and the Plague Counts, Butler must still demonstrate that he was prejudiced as a result. See United States v. Bieganowski, 313 F.3d 264, 287 (5th Cir. 2002). A district court should conduct separate trials if it appears that the defendant will be prejudiced by the joinder of offenses. Id. "To demonstrate reversible error, even where initial joinder was improper, a defendant must show clear, specific and compelling prejudice that resulted in an unfair trial." United States v. Simmons, 374 F.3d 313, 317 (5th Cir. 2004).

Butler maintains that the number of counts for which he was charged was prejudicial in and of itself. Citing Drew v. United States, 331 F.2d 85, 88 (D.C. Cir. 1964). This Court has, however, specifically rejected that assertion. United States v. Fagan, 821 F.2d 1002, 1007 (5th Cir. 1987) (noting that being tried on multiple counts, "standing alone is not grounds for a new trial"). We have also determined that any possible prejudice can be cured by proper jury instructions administered by the district court. United States v. Bullock, 71 F.3d 171, 175 (5th Cir. 1995). In this case, the district court instructed the jury as follows:

> A separate crime is charged in each count of the indictment. Each count, and the evidence pertaining to it, should be considered separately. The fact that you may find the defendant guilty as to one of the crimes charged should not control your verdict as to any other

10

crime.

The jury acquitted Butler on ten of the fraud counts, nine of the illegal transportation of plague counts, both of the counts charging Butler with making false statements to FBI agents, and the one tax count. Such a verdict reveals that the jury was able to follow proper jury instructions, separately consider each charge independently, and avoid being swayed or confused by the sheer number of counts for which Butler was indicted. Because Butler has not established that the initial joinder was improper, nor that he was prejudiced by such joinder, the district court was within its discretion when it denied Butler's motion to sever the Contract and Plague Counts.

**II. Whether the district court erred by refusing to allow Butler to conduct discovery relating to foreign witnesses.**

Butler argues the district court erred when it denied his request to take depositions of four witnesses in Tanzania who allegedly had direct knowledge of his research in that country.

We review a district court's discovery rulings for an abuse of discretion. Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 817 (5th Cir. 2004). We will affirm unless the rulings are arbitrary or clearly unreasonable. Id. (citing Moore v. Willis Indep. Sch. Dist., 233 F.3d 871, 876 (5th Cir. 2000) (internal quotations omitted)). A court may grant a motion seeking to depose a prospective witness based only on "exceptional circumstances and in the interest of justice." FED. R. CRIM. P. 15(a)(1). Butler has not

11

demonstrated exceptional circumstances or that taking these particular depositions would serve the interest of justice.

Butler had been under indictment, including charges of which the foreign witnesses would purportedly have had material knowledge, since April 2003. In May 2003 and again in August 2003, both parties sought a continuance of the trial, with Butler indicating in both instances the need to conduct discovery from these Tanzanian witnesses. Both of these motions were granted. Then, on August 25, 2003, Butler again sought leave to take the depositions of the foreign witnesses. The district court denied the motion on September 11, 2003, stating that the motion was "untimely and dilatory" in nature. The district court also noted that the evidence sought was not material and the lengthy and indeterminate continuance that would have resulted was impracticable.

Essentially, Butler maintains the foreign witnesses would have supported Butler's contention at trial that he had a good faith belief that he was in compliance with the rules of both U.S. and Tanzanian requirements for shipping *yersinia pestis*. As the Government points out, however, this information would have had little material value as to Butler's convictions for mailing the plague samples <u>from the United States</u> to Tanzania. Butler was convicted for violating U.S. export rules, not rules promulgated in Tanzania for exporting items out of that country. In addition, the

jury acquitted Butler of all charges relating to the transporting of *yersinia pestis* from Tanzania to the United States — the only relevant information of which the Tanzanian witnesses presumably would have had knowledge.

Based on the substance of the testimony Butler suggests the foreign witnesses would have provided, which materially relates to counts on which Butler was acquitted, the district court did not abuse its discretion when it denied Butler's motion.

**III. Whether the district court erred in quashing Butler's pretrial subpoena requesting the production of documents from HSC.**

Butler argues the district court erred by refusing his request to obtain from HSC all emails relating to him. Specifically, Butler contends that because the Government placed Butler's dealings and relations with HSC administrators at the heart of its prosecution, it was an abuse of discretion for the district court not to allow Butler the opportunity to pursue his theory that there existed an animosity between he and HSC officials and that the testifying HSC officials had acted in an improper and retaliatory manner toward Butler.

According to the Government, Butler's subpoena requested documentation of any kind from September 2003 dating back to 1986 in 28 different subject matter categories. These requested documents included compensation agreements and personnel files for 15 different people; financial audits on Butler or his studies; internal correspondence regarding Butler; Butler's performance

13

reviews; Butler's contributions to HSC; a grievance Butler filed against an HSC administrator; correspondence on Butler's grant funds, financial arrangements, audits, and retaliation claims; "correspondence on communications"; and correspondence between criminal agents and HSC.[4]

The district court determined that Butler's subpoena was "too broad and vague" and amounted to "a fishing expedition and an attempt to conduct general discovery as against the Health Sciences Center." The court concluded that the subpoena was therefore "oppressive and unreasonable and must be quashed in its entirety."

We review a district court's granting of a motion to quash a subpoena for an abuse of discretion. United States v. Loe, 248 F.3d 449, 466 (5th Cir. 2001). An order quashing a subpoena is proper if "compliance would be unreasonable or oppressive." FED. R. CRIM. P. 17(c)(2). This Court has previously determined that a party seeking such a subpoena must establish: "(1) the subpoenaed document is relevant, (2) it is admissible, and (3) that it has been requested with adequate specificity." Loe, 248 F.3d at 466 (citation omitted). Based on a review of Butler's subpoena motion, Butler has failed to satisfy two of the three required conditions. First, the breadth of subject matter that Butler sought failed to

_____

[4] The Government uses as further evidence of the broadness of Butler's subpoena motion his request for all correspondence amongst Frank Coleman, Glenda Helfrich, and Pat Campbell. Ms. Helfrich was an attorney for HSC and thus many, if not all, of her communications would have likely been privileged.

14

evoke any real relevance to the particular counts for which he was charged, and second, many of the requested documentation clearly lacked the requisite specificity.  Accordingly, the district court did not abuse its discretion when it quashed Butler's subpoena.

**IV. Whether the district court erred by allowing into evidence HSC policies and procedures relating to researchers' contracts with outside entities, including pharmaceutical companies.**

Butler argues one of the controversies at trial involved identifying what contracts between HSC researchers and outside entities were covered by HSC's policies requiring researchers to pay HSC a percentage of monies received under those particular contracts.  Butler maintains the district court erred when it denied his motion in limine that sought to bar the use of HSC's shared fee policies as evidence of Butler's alleged criminal conduct.

Butler contends that <u>United States v. Christo</u>, 614 F.2d 486 (5th Cir. 1980), which held that civil regulations cannot be used to establish criminal liability, bars the Government's use of HSC policies as a basis for finding criminal liability against Butler on the Contract Counts.  <u>Id.</u> at 491-92.  Butler suggests that the Government's violation of the principle enunciated in <u>Christo</u> is made even more egregious based on the fact that the Government used school policies to establish liability — a less formal and authoritative source than the prohibited civil regulations. Arguing that the Government blurred the distinction between

15

criminal law and HSC policies, Butler asserts that the testimony elicited from HSC officials suggested it was Butler's failure to comply with HSC policies that would ultimately be determinative of Butler's guilt or innocence. Lastly, Butler cites Ninth Circuit case law for his contention that jury instructions, such as the one given in this case, cannot cure a Christo violation. See United States v. Wolf, 820 F.2d 1499 (9th Cir. 1987). Conversely, the Government maintains that it never presented to the jury a theory that violations of HSC policies automatically rendered Butler's conduct criminally fraudulent. Instead, argues the Government, it was saddled with the burden of establishing that Butler acted intentionally and willfully in order to prove the fraud counts and simply used the policies to demonstrate such intent.

We review a district court's evidentiary rulings for an abuse of discretion. Kelly v. Boeing Petroleum Servs., Inc., 61 F.3d 350, 356 (5th Cir. 1995). Any erroneous evidentiary ruling is reversible error only if it affects a party's substantial rights. Id. at 361. In Christo, the case was remanded in large part because of the instruction to the jury that the legality of certain banking overdrafts had to be viewed in light of the civil banking restrictions on loans to officers. 614 F.2d at 491. This Court found problematic what it saw as the prosecution attempting to bootstrap a violation of a civil regulation into a criminal felony. Id. at 492. In this case, the Government persuasively argues that the testimony allowed by the district court was introduced to

16

explain that HSC's policies simply governed Butler's conduct. The Government cites to two instances in the record where HSC officials, when asked by the defense whether violating the policies was itself a crime, both agreed that it was not. The introduction of the policies was for the purpose of establishing Butler's knowledge of the policies and his willfulness thereafter in defrauding HSC.

Moreover, the district court gave the jury a limiting instruction in which the court cautioned:

> You have heard testimony that Dr. Butler may have violated TTUHSC's Operating Policies and Procedures ("TTUHSC's Policies"). A violation of TTUHSC's Policies in itself is not a criminal offense.
>
> The government must prove all of the elements of the crimes charged, beyond a reasonable doubt. For example, even if you assume that Dr. Butler violated TTUHSC's Policies, the fact that TTUHSC's Policies were not followed does not necessarily mean that Dr. Butler possessed the requisite criminal intent to commit the offenses charged or that the government has proved the elements of the alleged crimes. If you find beyond a reasonable doubt from the other evidence in this case that Dr. Butler did commit the acts charged in the Indictment, then you may consider the evidence of a violation of TTUHSC's Policies for the limited purpose of determining whether Dr. Butler had the state of mind or intent necessary to commit the crimes charged in the Indictment.

This Court has previously determined that this type of limiting instruction is appropriate under these circumstances. In United States v. Brechtel, 997 F.2d 1108 (5th Cir. 1993), this Court stated that "we and our colleagues in other circuits have recognized the value of limiting instructions in attenuating any

17

improper effect of such evidence when used for a permissible purpose." Id. at 1115 (citing United States v. Cordell, 912 F.2d 769, 777 (5th Cir. 1990); United States v. McElroy, 910 F.2d 1016, 1023-24 (2d Cir. 1990); United States v. Smith, 891 F.2d 703, 710 (9th Cir. 1989); United States v. Stefan, 784 F.2d 1093, 1098 (11th Cir. 1986)). The instruction issued by the district court clearly sets forth that any evidentiary reference to HSC policies made during the trial was for the limited purpose of establishing Butler's alleged criminal intent. Accordingly, even if we were to identify any error in the district court's decision to admit these policies into evidence, this particular instruction would cure any such error.

In sum, because the HSC policies were admitted for the limited purpose of establishing criminal intent on the part of Butler, and because the district court issued a comprehensive limiting instruction further clarifying the purpose of that evidence, we find no reversible error.

**V.  Whether the Government presented sufficient evidence as to the Contract and Plague Counts.**

Butler next argues there was insufficient evidence to support his conviction on the Contract Counts because the HSC policies were vague, thus casting doubt on the *mens rea* element of the crime. Butler also contends the Government failed to prove beyond a reasonable doubt that he willfully violated United States export control laws or hazardous material regulations.

18

We review a challenge to the sufficiency of the evidence in a criminal case to evaluate "whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt." Bieganowski, 313 F.3d at 275 (citation and internal quotations omitted). The jury retains the sole responsibility for determining the weight and credibility of the evidence. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995). In evaluating the evidence, we view all evidence and all reasonable inferences drawn from it in the light most favorable to the government. Bieganowski, 313 F.3d at 275. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." Id.

As to Butler's argument regarding the Contract Counts, and more specifically his contention that the HSC policies were vague and therefore subject to misinterpretation, there was evidence introduced at trial that HSC reminded Butler by memo six times that he was not to sign contracts with grantors for work done at HSC. The Government contends these memos prove Butler's state of mind regardless of whether he reviewed or understood HSC's posted policies. Butler also argues that he thought the agreements he entered into with Pharmacia and Chiron were consulting contracts.[5]

---

[5] As stated previously, both parties stipulate that pure consulting contracts were not subject to the restrictions placed on clinical studies, research grants, or any other type of venture that involved use of HSC's resources.

19

The Government points out, however, that it introduced at trial: (1) language in these agreements between Butler and the pharmaceutical companies indicating that the studies were for clinical work (and thus subject to HSC's policies); (2) differences between the agreements and other documents entered into evidence entitled "Consulting Agreements"; and (3) testimony from the pharmaceutical representatives themselves, who characterized the split contracts as clinical study agreements. Based on this evidence alone, the Government presented sufficient evidence of Butler's intent to defraud HSC such that a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt.

Next, Butler maintains there was insufficient evidence to support the jury's finding that he willfully: (1) exported *yersinia pestis* to Tanzania without a license; (2) described in a misleading manner the *yersinia pestis* as "laboratory materials" on the FedEx waybill; and (3) violated federal hazardous material regulations when he shipped the *yersinia pestis* to Tanzania.

As to the first sub-issue, the Government points this panel to evidence introduced at trial that Butler certified on the FedEx waybill that the samples were being "exported . . . in accordance with Export Administration Regulations," when in fact they were not. The Government notes that Butler had in his office a document downloaded from the Center for Disease Control website that clearly

indicated a Department of Commerce permit was required to export *yersinia pestis*. As further evidence of Butler's knowledge of export requirements, the Government observes that Butler previously signed four waybills shipping hazardous materials to Canada and checked the box indicating a Shipper's Export Declaration was not needed (which it is not in those circumstances). Moreover, the Government introduced evidence that during the 1990s, Butler properly shipped infectious substances and other dangerous goods more than 30 times. Based on this evidence, Butler's argument here must fail.

With regard to Butler's conviction for making a false statement by labeling the *yersinia pestis* as "laboratory materials," he contends that because he did not intend to deceive anyone, he cannot be found to have acted willfully. The Government responds by noting that Butler also certified on that same label that he was not shipping dangerous goods. According to the Government, a reasonable person certainly could conclude that an accomplished researcher, who was the Chief of Infectious Diseases at HSC and had spent considerable time studying plague abroad, would have known that plague was a dangerous good requiring the proper identification thereof. Accordingly, Butler's sufficiency of the evidence argument on this sub-issue is also without merit.

Finally, Butler contends his conviction for violating hazardous material regulations required the Government to prove

21

that his infraction could not have been due to a good faith mistake or misunderstanding of the law. The Government responds with an argument identical to its reason why there was sufficient evidence establishing Butler's unlawful export of *yersinia pestis* to Tanzania without a license: Butler had successfully and legally shipped hazardous materials at least 30 times before making this particular shipment. Importantly, Butler comes forward with no specific evidence of his own on appeal refuting the Government's evidence, or establishing what about his actions warranted a finding that he made a good faith mistake or misunderstood the law. Without more, a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt.

## VI. Whether the district court's use of the 2001 Sentencing Guidelines in sentencing Butler was in violation of the *Ex Post Facto* Clause.

Butler argues the district court erred in using the 2001 version of the Sentencing Guidelines, instead of the 2000 version, for purposes of his sentencing. Butler contends he was convicted on two sets of discrete charges that occurred during different time periods. Specifically, Butler notes that the events relating to the Contract Counts took place between August 1998 and August 2001, while the events underlying the Plague Counts transpired during 2002. Because the activities relating to the Contract Counts were completed by August 2001, argues Butler, the 2000 version should have been applied as it was in effect at that time. Butler

22

explains that had the 2000 version been used, his offense level would have been reduced by four.

This Court reviews the district court's application of the Guidelines <u>de</u> <u>novo</u> and its findings of fact for clear error.[6] The district court shall apply the Guidelines in effect on the date the defendant was sentenced, U.S. SENTENCING GUIDELINES MANUAL § 1B1.11(a) (2004), unless such application violates the *Ex Post Facto* Clause of the Constitution, and in that case, the district court shall apply the manual in effect on the date the offense of conviction was committed, <u>id.</u> § 1B1.11(b)(1).

In determining the appropriate version of the Guidelines for sentencing purposes, the district court appears to have employed the one-book rule, which provides that where a "defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to applied to both offenses." <u>Id.</u> § 1B1.11(b)(3). In following this clarifying provision, the district court applied the 2001 version of the Guidelines which was in effect on the date the events underlying Butler's last conviction occurred in September 2002. Moreover, the commentary to § 1B1.11(b)(3) provides that this

---

[6]We employ this standard of review even as to those limited cases on direct appeal at the time <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), was issued where the district court sentenced under a mandatory guideline system. <u>See</u> <u>United States v. Villegas</u>, 404 F.3d 355, 359 (5th Cir. 2005).

23

approach:

> [S]hould be followed regardless of whether the offenses of conviction are the type in which the conduct is grouped under § 3D1.2(d). The ex post facto clause does not distinguish between groupable and nongroupable offenses.

Id. § 1B1.11(b)(3), cmt. background.[7] Moreover, this Court has previously concluded that application of § 1B1.11(b)(3) in instances similar to the one here is permissible and does not violate the *Ex Post Facto* Clause. See United States v. Kilmer, 167 F.3d 889, 895 (5th Cir. 1999). Based on the relevant guideline provisions and the applicable commentary, we reject Butler's *ex post facto* challenge to his sentence.

## CONCLUSION

Having carefully reviewed the entire record of this case, and having fully considered the parties' respective briefing and arguments, we conclude the district court did not commit reversible error by refusing to sever the Contract Counts from the Plague Counts. Moreover, the district court made appropriate discovery and evidentiary rulings. Also, there was sufficient evidence supporting Butler's convictions under the Contract Counts and the Plague Counts. Finally, the district court's application of the 2001 Sentencing Guidelines was not violative of the *Ex Post Facto* Clause. Accordingly, we AFFIRM Butler's conviction and sentence.

---

[7] Butler's criminal convictions under the Contract Counts and Plague Counts are not identified in § 3D1.2(d) as groupable offenses.

24

**AFFIRMED.**